**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**December 3, 2009**

**Elisabeth A. Shumaker**
**Clerk of Court**

<u>PUBLISH</u>

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

MARVIN W. COUCH, II, M.D.,

     Plaintiff-Appellant,

v.

BOARD OF TRUSTEES OF THE
MEMORIAL HOSPITAL OF
CARBON COUNTY; PATSY
CARTER; DAVID CESKO, M.D.;
DUANE ABELS, D.O.; ARCHIE
KIRSCH, M.D.; CHARLES YOUNG,
M.D.; KENNETH SCHULZE, M.D.;
PALUR SRIDHARAN, M.D.; V.
RAJA CHANDRASEKARAN, M.D.,

    Defendants-Appellees.

No. 08-8001

---

## ORDER

---

Before **TACHA, EBEL,** and **HARTZ**, Circuit Judges.

Through clerical error, the opinion filed in this case on November 17, 2009,

omitted the concurrence of Judge Hartz. The attached opinion, which now

includes the concurrence but is otherwise unchanged, is hereby filed nunc pro

tunc to the original filing date.

Entered for the Court

Elisabeth A. Shumaker, Clerk

FILED
United States Court of Appeals
Tenth Circuit

November 17, 2009

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

MARVIN W. COUCH, II, M.D.,

     Plaintiff–Appellant,

v.

BOARD OF TRUSTEES OF THE
MEMORIAL HOSPITAL OF
CARBON COUNTY; PATSY
CARTER; DAVID CESKO, M.D.;
DUANE ABELS, D.O.; ARCHIE
KIRSCH, M.D.; CHARLES YOUNG,
M.D.; KENNETH SCHULZE, M.D.;
PALUR SRIDHARAN, M.D.; V.
RAJA CHANDRASEKARAN, M.D.,

     Defendants–Appellees.

No. 08-8001

**Appeal from the United States District Court
for the District of Wyoming
(D.C. No. 2:06-CV-00052-ABJ)**

Elizabeth A. Phelan (Gregory R. Piché and Mark B. Wiletsky, with her on brief),
of Holland & Hart LLP, Boulder, Colorado, for Appellant.

Janet Schroer (Monty Barnett, John Lebsack and James M. Meseck on brief), of
White and Steele, P.C., Denver Colorado, for Appellees.

Before **TACHA, EBEL,** and **HARTZ**, Circuit Judges.

**EBEL**, Circuit Judge.

Dr. Marvin Wayne Couch appeals from summary judgment entered in favor of defendants, Memorial Hospital of Carbon County ("MHCC"), a small rural hospital where he has staff privileges, the hospital's chief administrator, and six of the ten other physicians who have privileges at MHCC. Dr. Couch brought this action, pursuant to 42 U.S.C. § 1983, to remedy an alleged deprivation of his First Amendment right of free speech caused by a "campaign of retaliation" he allegedly had to endure as a result of speaking out about substance abuse at MHCC. The district court concluded that Dr. Couch's claims failed because he could not establish that the defendants actions would chill speech nor could he establish that the defendants' actions were substantially motivated by his speech. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we AFFIRM for the reasons that follow.

## I. BACKGROUND

A.    Factual Background

Dr. Marvin Wayne Couch, II, M.D., is a family doctor/obstetrician in Rawlins, Wyoming. A graduate of the University of Wyoming School of Medicine, Dr. Couch moved to the Rawlins area in 1997 when he was recruited to join MHCC as part of an effort to build the hospital's obstetrics practice. Soon after Dr. Couch joined MHCC, interpersonal conflicts began to develop between

Dr. Couch and Dr. David Cesko, M.D., another family doctor and obstetrician who joined MHCC about the same time as Dr. Couch. Dr. Couch began to have conflicts with medical staff as well.[1] Time, however, did not heal Dr. Couch's relationships with Dr. Cesko or hospital staff.

By the summer of 2001, Dr. Couch had begun to suspect that Dr. Cesko and other staff physicians at MHCC were using alcohol and illegal drugs. Dr. Couch shared his concerns with the hospital's chief executive, Patsy Carter, and after he found her unresponsive, reported these concerns to the Wyoming Board of Medicine ("WBM"), a state agency that governs licensing of medical doctors. To address these concerns, Dr. Couch also approached the hospital's Board of Trustees about changing the hospital's testing policy from a for-cause drug and alcohol testing policy to a random testing policy. The Board subsequently discussed a random testing policy over several monthly Board meetings in the winter and spring of 2002, but ultimately concluded not to implement any changes to the drug and alcohol testing policy. Dr. Couch, however, continued to raise

---

[1] These conflicts were first documented in 1999 in a report by the American College of Obstetricians and Gynecologists ("ACOG") on the quality of care of MHCC's obstetrics practice. The ACOG report was voluntarily solicited by MHCC to evaluate Drs. Couch and Cesko's "qualifications and skill levels" to provide certain obstetric services. (Aplt. App. 374) The report specifically noted that Dr. Couch was "hypersensitiv[e] to criticism," that he had a demeanor that others perceived "to be more arrogant and abrasive than [Dr. Couch] realizes or intends," and that Dr. Couch "seems less willing than [Dr. Cesko] to openly share and explain his thought processes to the nursing staff in order to foster an educational process. (Id. at 383-88.)

concerns about substance abuse at MHCC, and even filed a request with the WBM, in November 2002, to drug test a fellow physician, Dr. Scott Thomas, and to investigate whether Dr. Thomas had mistreated patients as a result of a drug impairment. Dr. Couch also continued to advocate for random drug and alcohol testing, for instance, when he delivered a presentation to the Wyoming Healthcare Commission at a September 2003 meeting, endorsing "a policy for the random testing for drugs and alcohol for physicians and other health care providers." (Aplt. App. 1277, 1289.)

In 2006, Dr. Couch subsequently brought this action pursuant to 42 U.S.C. § 1983, alleging that the hospital and various individual defendants, who were on hospital committees, instituted a "campaign" of retaliation against him for his advocacy of a drug and alcohol testing, in violation of his First Amendment right to free speech. The alleged "campaign" of retaliation included his non-reappointment to a seat on the Medical Staff Performance Assessment and Improvement Committee; several hospital investigations into disruptive conduct by Dr. Couch; alleged patient mistreatment; billing and Medicare fraud; and the hospital's subsequent implementation of the corrective actions recommended by those investigations. We will briefly detail the hospital's investigations involving Dr. Couch and the hospital's corrective action below, which was thoroughly recounted by the district court in its order granting summary judgment for the defendants.

### 1. *2001 Rardin Investigation*

The first alleged incidents of retaliation arose in October 2001, when MHCC's counsel, at the direction of the hospital's Board of Trustees (the "Board"), solicited Thomas Rardin, a private investigator, to investigate the relationship between Drs. Couch and Cesko. As Rardin noted in his report of the investigation, the Board was concerned that the acrimonious relationship might "adversely affect[]" employees and the community. (Aplt. App. 471.) After interviewing numerous staff members, and the doctors themselves, Rardin concluded both doctors had engaged in inappropriate conduct towards each other.[2] Rardin's report recommended that the hospital should send a letter to both doctors "telling them to stop and either get along or maturely tolerate each other," and discussed the possibility of "psychological testing." (Id. at 421.)

MHCC's Chairman of the Board of Trustees, Judy Merrill, adopted Rardin's recommendation and sent Dr. Couch a letter, which acknowledged that the report uncovered disruptive conduct, and that clarified hospital procedures, instructed him not to ask people about Dr. Cesko's personal life and not to make disparaging comments about Dr. Cesko, and to follow the established chain of command with regards to all complaints about hospital staff. Ms. Merrill sent a

---

[2]Rardin noted that "Dr. Cesko appears to have lowered the level of his [negative] activities and conduct in relation to Dr. Couch"; however, many of the interviewees "believe[d] that Dr. Couch has not changed much and may not be able to change." (Aplt. App. 419-21.)

similar letter to Dr. Cesko.  Dr. Couch considered that the letter only "asked [him] to do [ ] things [he] was already doing."  (Id. at 981.)

### 2. *Disruptive Conduct Investigation*

As discussed above, Dr. Couch filed a complaint with the WBM in November 2002, alleging Dr. Thomas made two critical errors, and requested "that the Board of Medicine require a hair drug test of Dr. Thomas . . . ."  (Aplt. App. 558-59.)  On April 14, 2003, the WBM informed Dr. Couch by letter that the Board's "investigation of this matter has disclosed no evidence that Dr. Thomas was either impaired and/or incompetent as alleged in your complaint." (Id. at 563.)  Following the WBM's finding that Dr. Couch's complaint against Dr. Thomas and his request for Dr. Thomas to undergo drug testing were unsubstantiated, Dr. Thomas, on May 20, 2003,  filed a "disruptive conduct report"[3] with MHCC's Executive Committee,[4] complaining that Dr. Couch reported Dr. Thomas to the WBM without first discussing those concerns with Dr.

---

[3]The hospital's disruptive conduct policy provides that "[s]ingle incidents or patterns of conduct which demonstrate unprofessional or uncooperative behavior constitute disruptive conduct, and shall be addressed in accordance with this policy." (Aplt. App. 1069.)

[4]MHCC has numerous different committees that are largely composed of physicians who have privileges at the hospital, and also often include the hospital's chief administrator.  The hospital's bylaws provide that the Executive Committee's has broad responsibilities including "coordinat[ing] the activities and general policies of the various [hospital] services"; "receiv[ing] and act[ing] upon committee reports]"; and "implement[ing] policies of the Medical Staff." (Aplt. App. 661.)

Thomas and following internal review procedures.[5]  In response to the complaint, on June 19, 2003, Dr. Duane Abels, the hospital's chief of staff, established an ad hoc committee consisting of Drs. Archie Kirsch and Charles Young to investigate Dr. Thomas's complaint.  In turn, the ad hoc committee hired Thomas Rardin to investigate the matter.

As a result of his investigation, Rardin prepared a report detailing the substance of his interviews with the doctors and medical staff,[6] which the ad hoc committee relied on in its "findings of investigation," dated September 18, 2003, concluding that "the method Dr. Couch chose to handle his complaint about Dr. Thomas' care . . . was inappropriate" and "constitute[d] disruptive conduct." (Aplt. App. 669.)  The ad hoc committee explained that Dr. Couch's conduct was inappropriate because he "did not follow established practices of medical staff peer review. [And] Dr. Couch was not open and honest with Dr. Thomas or the Critical Care Committee [investigating Dr. Thomas's alleged errors] about his

---

[5]Dr. Thomas also stated his belief that Dr. Couch's report to the WBM was "less an anxious expression of true concern . . . for patient care and more a crass and calculated attack on myself and my license to practice."  (Aplt. App. 566.)  Dr. Thomas later explained that "he believe[d] that Couch made the complaint against him because of his opposition to random drug testing." (Id. at 677.)

[6]Rardin investigated the allegations in the complaint and conducted interviews of Drs. Couch and Thomas, as well as hospital staff members and Ms. Carter.  Rardin's report also included an interview with an anonymous nurse who explained that he or she was concerned about Dr. Couch's mistreatment of a patient, who subsequently died under his care, and that Dr. Couch's medical and billing records did not accurately reflect Dr. Couch's treatment of the patient.

feelings that Dr. Thomas was impaired and committed 'two major medical mistakes.'" (Id.)  The ad hoc committee then forwarded its report on the disruptive conduct complaint to the Credentials Committee.[7]

The Credentials Committee "concluded that in order for the investigation to proceed a mental/psychiatric evaluation is needed."  (Aplt. App. 1357.)  By a letter dated October 31, 2003, the Committee directed Dr. Couch to receive an evaluation, at his own expense, with Dr. Michael Gendel in Denver, Colorado.  After evaluating Dr. Couch on January 23, 2004, interviewing Dr. Couch's references, and reviewing pertinent documents from the hospital, Dr. Gendel prepared a report, dated February 2004, concluding that Dr. Couch did not suffer from a mental illness or disability.  However, Dr. Gendel did recommend that Dr. Couch seek pyschotherapeutic help to "develop more nuanced social skills and to better recognize social demands and realities," or alternatively "coaching," which is "a kind of assistance which focuses on the practical difficulties faced in difficult workplace situations, and their practical solutions."  (Id. at 694.)

The Credentials Committee reviewed Dr. Gendel's report and on May 11, 2004, it recommended to the Executive Committee that Dr. Couch "be placed

---

[7] The Credentials Committee's responsibilities, according to the hospital's bylaws, include "review[ing] the credentials of all applicants for medical staff appointment, reappointment, clinical privileges [and] mak[ing] investigations of . . . such applicants as may be necessary"; and "maintain[ing] continuing surveillance of the professional performance of all individuals who have clinical privileges in the hospital, and report and make recommendations to the Board as needed."  (Aplt. App. 656.)

- 8 -

on probation," that he be ordered to "undergo psychotherapeutic treatment with a psychiatrist chosen by the Credentials Committee," that he be required to meet with the Credentials Committee every three to six months and present a progress report from the psychiatrist, and that medical staff be informed of the situation and required to report any disruptive behavior. (Aplt. App. 1359.)

On June 2, 2004, the Executive Committee approved all of the Credentials Committee's recommendations concerning Dr. Couch's disruptive conduct, including the probation recommendation, and Dr. Couch was advised accordingly. On January 20, 2005, the Executive Committee revisited this decision and affirmed its June 2, 2004 disposition. Dr. Couch subsequently appealed the Executive Committee's action to an independent three-person hearing panel.[8]

### 3. *Billing Fraud Investigation*

On September 30, 2003, around the time the ad hoc committee had completed its investigation of the disruptive conduct complaint, Patsy Carter, suspecting that Dr. Couch might have billed for services he did not perform, sent the records of three patients[9] to the Mountain-Pacific Quality Health Foundation

---

[8]An appeal normally would go before the "Committee of the Whole," but Dr. Couch entered into an agreement with the hospital for his appeal to be heard before an independent panel.

[9]The first patient whose records were sent to MPQHF was Joe Jones, a member of the MHCC Board of Trustees who was treated by Dr. Couch on July 29, 2002. Mr. Jones initially reported his dissatisfaction with the way he was billed to Ms. Carter in October 2002. After consulting with MHCC's attorney,

(continued...)

- 9 -

("MPQHF") for evaluation of whether Dr. Couch committed Medicare or billing fraud.[10]  MPQHF's report confirmed the hospital's suspicions, and indicated that both of MPQHF's peer reviewers concluded that Dr. Couch apparently was billing for services that were not performed.  The report recommended that Dr. Couch receive thirty hours of training in charting in the next six months, be suspended from call rotation for six months, and be required to dictate all his charts within twenty-four hours of providing patient services.  Further, the report recommended that Dr. Couch be reported "to the Wyoming Board of Medicine and to the

---

[9](...continued)
Ms. Carter told him that he should raise billing issues with Medicare.  Mr. Jones initially filed a complaint with Medicare but "called them back and 'dropped his complaint' . . . [because] this was a serious matter and . . . he did not want to 'ruin Dr. Couch's life.'"  (Aplt. App. 1328.)

The second patient, Sharon Wilda, was treated by Dr. Couch in March 2002.  Ms. Wilda later reported to Dr. Young that Dr. Couch had billed for an "extensive Health and Physical" but had only looked down her throat and listened to her heart.  (Id. at 1329.)

The third patient, Corrine Klewin, was treated by Dr. Couch in April 2003. Ms. Klewin presented with shortness of  breath and the nurses paged Dr. Couch multiple times but he did not arrive until over three hours later.  By that time, the patient had "coded," and was placed on a ventilator.  Dr. Couch billed for a complete physical, although he apparently could not have conducted such a physical once the patient had "coded."  Rardin's investigation had revealed that at least one nurse considered that Dr. Couch had billed for services that he could not have performed in this case.

[10]It is disputed whether the hospital's Medical Staff PA&I Committee had initially determined that it suspected that Dr. Couch had engaged in inappropriate billing practices before Ms. Carter sent the records out to be independently evaluated by MPQHF.

- 10 -

National Practitioner Data Bank for his careless actions." (Aplt. App. 1032.) As per MPQHF's recommendations, Ms. Carter forwarded MPQHF's report to the WBM.[11]

Based on the results of the MPQHF report, the Credentials Committee, on March 2, 2004, informed Dr. Couch that he was required "to obtain 30 hours of training on proper coding and physician responsibility for coding in a formal setting within the next 6 months." (Aplt. App. 1372.) In an apparent effort to get that training, Dr. Couch subsequently "attended a practice management course"; however, the Credential Committee determined that the course did not fulfill the proper course training requirements. (Id.) This matter was then forwarded to the Executive Committee, which voted, on January 20, 2005, "to reduce [Dr. Couch's] clinical privileges in that he will be suspended from call rotation for unassigned patients until he attends a total of 30 hours of training in proper coding and physician responsibility in coding." (Id. at 700.)

---

[11]In response, on August 3, 2004, the WBM sent a letter to Dr. Couch addressing the billing issues; although the letter did not conclude that he fraudulently billed, it admonished him for his failure to promptly chart the services of these three patients. The letter of admonition was made part of Dr. Couch's permanent file, but it was not made available to the public.

## 4. *Patient Mistreatment Issues*

In January 2005, the Medical Staff Performance Assessment and Improvement ("PA&I") Committee[12] began a review of several of Dr. Couch's cases, including the death of a patient, Corrine Klewin, while under Dr. Couch's care. The Critical Care Committee had previously initiated the review after Klewin's death in 2003, and had sent her medical records to be reviewed by an independent reviewer, who had noted that the main cause of death was "hyperglycemia and acidosis," not hypotension, which was the main focus of Dr. Couch's treatments. (Aplt. App. 1026.) Based on the PA&I's review of Dr. Couch's treatment of Ms. Klewin, the Committee requested him to attend appropriate continuing medical education training on diabetic ketoacidosis.

## 5. *Administrative Proceeding*

On February 1, 2005, Patsy Carter sent Dr. Couch a letter formally charging him with two counts of disruptive conduct. Count I involved a litany of events including Dr. Couch's conflicts with Drs. Cesko and Thomas, and his recent failure to attend psychiatric treatment as required by the Executive Committee. Count II involved MHCC's concerns about Dr. Couch's charting and billing practices and his failure to attend training in proper coding as required by

---

[12] The Medical Staff PA&I Committee's responsibilities, according to the hospital's bylaws, include "monitor[ing] compliance with the Medical Staff PA&I Plan"; "review[ing[ fallouts of designated Medical Staff PA&I indicators to identify opportunities for improvement"; and "review[ing] clinical pertinence." (Aplt. App. 655.)

the Executive Committee. Dr. Couch requested a due process hearing on these charges, and MHCC and Dr. Couch entered into an agreement for a hearing before an independent panel.

The scope of the hearing was subsequently expanded after the Credentials Committee voted to recommend denying Dr. Couch's reappointment to the medical staff of MHCC, which was communicated to Dr. Couch in January 2006. Re-appointment is required every two years, and based on Dr. Couch's "behavioral issues" and inappropriate care and treatment of several patients, including Ms. Klewin, the Credentials Committee had recommended to the Board that Dr. Couch not be reappointed to the medical staff.

The independent hearing panel heard testimony over four days in May and July of 2006, during which time Dr. Couch was represented by legal counsel. On July 26, 2006, the independent three-person panel issued a thorough report. The panel determined that Dr. Couch "is a generally technically proficient practitioner" but had provided substandard care to several patients, including substandard management of diabetic ketoacidosis in the case of Corrine Klewin. (Aplt. App. 1069.) The panel concluded, however, that Dr. Couch had only billed for services that he had actually performed to Ms. Klewin, and that the panel did not have enough information to determine whether Dr. Couch had or had not billed for services that he did not perform for Ms. Wilda or Mr. Jones. The panel further found that Dr. Couch's inability to accept responsibility and "get along

with many of his peers" is "disruptive to hospital operations and impact[s] negatively on his ability to deal with hospital employees [and medical staff members]." (Id. at 1076.) Also, the panel found that "Dr. Couch is disruptive in that he fails to fulfill his work on the committees of the hospital."[13] (Id.)

The hearing panel ultimately recommended that: (1) Dr. Couch should be evaluated by a mutually agreed-upon psychiatrist; (2) Dr. Couch should properly follow-up on any recommendations made by the psychiatrist; (3) Dr. Couch should "make a documented good faith effort to improve relations" with MHCC staff and doctors; (4) Dr. Couch should attend his committee meetings; (5) Dr. Couch should "demonstrate competence in Diabetic Ketoacidosis management"; and (6) Dr. Couch's privilege to continue practicing at MHCC should be "conditionally granted subject to the foregoing terms." (Aplt. App. 1071-72.)

---

[13] The panel also noted that the Executive Committee lacked the authority to enforce its recommendation that Dr. Couch seek psychiatric assistance, but that the recommendation was fair (although the panel felt that the psychiatrist should have been a person who was mutually agreeable to Dr. Couch and the hospital not a psychiatrist selected by the hospital). Likewise, the panel determined that the Executive Committee could not place Dr. Couch on probation, but that "Dr. Couch knew or should have known, from the bylaws, [that] the Executive Committee could not [have] imposed [the] probation." (Aplt. App. 1065.)

The panel also addressed Dr. Couch's concerns that many of the physicians who testified before the panel were biased against him, and found that the "proceedings were not motivated by an improper bias." (Id. at 1067.) Similarly, the panel concluded that these proceedings were not "motivated by any improper bias." (Id.)

On October 23, 2006, the Board of Trustees adopted the independent panel's recommendations with only minor alterations.[14] (Aplt. App. 1082-84.)

B.      Procedural Background

On November 6, 2007, the district court granted the defendants summary judgment and Dr. Couch timely filed a Rule 59(e) motion to alter or amend the judgment. Dr. Couch argued that additional evidence, including an affidavit from an individual that she sold drugs to Dr. Cesko, established that defendants had a motive to retaliate against him for his efforts to institute a random alcohol and drug testing program because they were abusing drugs or alcohol or wanted to protect or cover-up others' substance abuse. The district court denied the motion, and this appeal follows.

## II. DISCUSSION

A.      Standard of Review

We review de novo the district court's grant of summary judgment, applying the same legal standard used by the district court. Brammer-Hoelter v. Twin Peaks Charter Acad., 492 F.3d 1192, 1201 (10th Cir. 2007). Summary

---

[14]The Board also stated that "[a] documented good faith effort" in improving his relations with MHCC staff and doctors "shall be noted by the absence of medical staff and/or hospital employees incident reports concerning Dr. Couch's disruptive conduct." (Aplt. App. 1083.) Further, the Board noted that "[w]hile adopting the Hearing Panel's recommendations . . . it is the Board's decision that the same should be complied with in the strictest sense and noncompliance will result in Dr. Couch's medical staff privileges being immediately terminated by the Board of Trustees." (Id.)

judgment should be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "When applying this standard, we view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party." Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs., 165 F.3d 1321, 1326 (10th Cir. 1999). Because this case involves the First Amendment, we independently examine the whole record to assure that the district court's judgment "does not constitute a forbidden intrusion on the field of free expression." Brammer-Hoelter, 492 F.3d at 1201 (quoting Citizens for Peace in Space v. City of Colo. Springs, 477 F.3d 1212, 1219 (10th Cir. 2007)).

B.      *Garcetti/Pickering* Analysis

"[T]he First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." Garcetti v. Ceballos, 547 U.S. 410, 417 (2006); see also Pickering v. Bd. of Educ., 391 U.S. 563, 568 (1968). Therefore, "a public employer cannot retaliate against an employee for exercising his constitutionally protected right of free speech." Dill v. City of Edmond, Okla., 155 F.3d 1193, 1201 (10th Cir. 1998) (citing Connick v. Myers, 461 U.S. 138, 146-47 (1983)). When analyzing a free speech claim based on retaliation by an employer, this court applies the five-

prong *Garcetti/Pickering* test.  Dixon v. Kirkpatrick, 553 F.3d 1294, 1301-02

(10th Cir. 2009).  Under the *Garcetti/Pickering* analysis,

> First, the court must determine whether the employee speaks
> pursuant to his official duties.  If the employee speaks pursuant to his
> official duties, then there is no constitutional protection because the
> restriction on speech simply reflects the exercise of employer control
> over what the employer itself has commissioned or created.  Second,
> if an employee does not speak pursuant to his official duties, but
> instead speaks as a citizen, the court must determine whether the
> subject of the speech is a matter of public concern.  If the speech is
> not a matter of public concern, then the speech is unprotected and the
> inquiry ends.  Third, if the employee speaks as a citizen on a matter
> of public concern, the court must determine whether the employee's
> interest in commenting on the issue outweighs the interest of the
> state as employer.  Fourth, assuming the employee's interest
> outweighs that of the employer, the employee must show that his
> speech was a substantial factor or a motivating factor in a detrimental
> employment decision.  Finally, if the employee establishes that his
> speech was such a factor, the employer may demonstrate that it
> would have taken the same action against the employee even in the
> absence of the protected speech.

Brammer-Hoelter, 492 F.3d at 1202-03 (internal quotations and alterations

omitted).  We have noted that "[i]mplicit in the [*Garcetti/*]*Pickering* test is a

requirement that the public employer have taken some adverse employment action

against the employee."  Belcher v. City of McAlester, Okla., 324 F.3d 1203, 1207

n.4 (10th Cir. 2003).

C.      Application of the *Garcetti/Pickering* Analysis

Dr. Couch alleges that he exercised his First Amendment right to speak in

two ways: (1) by advocating for a random drug and alcohol testing policy and (2)

by reporting to the hospital and WBM his concern that Dr. Thomas had a

substance abuse problem.[15]  The parties dispute whether Dr. Couch's speech is protected speech, i.e., whether it satisfies the first three prongs of the *Garcetti/Pickering* test.  We need not reach those issues because even assuming, without deciding, that Dr. Couch's speech is protected, we nonetheless conclude that he has failed to establish the fourth prong of Garcetti that his speech was (a) a substantial factor or a motivating factor in an (b) adverse employment action.

      i.      Substantial Motivating (Causation) Factor and Detrimental Employment Decision (Adverse Employment Action)

Under the fourth-prong of Garcetti, plaintiffs bear the burden of establishing both a detrimental employment decision (adverse employment action) and "causation—that is, that the constitutionally protected speech was a substantial motivating factor in the employer's decision to adversely alter the employee's conditions of employment."  Maestas v. Segura, 416 F.3d 1182, 1188 & n.5 (10th Cir. 2005).

The district court granted summary judgment in favor of defendants because Dr. Couch was unable to establish a genuine issue of fact on step-four of the Garcetti-analysis.  The court concluded that Dr. Couch had established neither (a) any adverse employment action by defendants nor (b) that any or all of the defendants' actions were motivated by Dr. Couch's speech.  Like the district

_____

[15] Dr. Couch's complaint only appears to allege that he exercised his First Amendment right to speak in regards to his advocacy of a random drug and alcohol testing policy; however, both parties address whether Dr. Couch's complaints about Dr. Thomas were protected speech.

- 18 -

court, we will consider in the analysis that follows both parts of Dr. Couch's burden at step four: that he establish an adverse employment action and that he establish causation.

With regard to the need to show causation as part of the fourth prong of Garcetti, we have said "Although protected conduct closely followed by adverse action may justify an inference of retaliatory motive, the mere temporal proximity of Plaintiff's protected speech to the adverse action is insufficient, without more, to establish retaliatory motive." Baca v. Sklar, 398 F.3d 1210, 1221 (10th Cir. 2005) (internal quotations, citations and alterations omitted). We have explained, for instance, that it might be relevant in establishing a retaliatory motive that "the employer expressed opposition to the employee's speech," Maestas, 416 F.3d at 1189, or that "the protected speech implicated the individual defendant in wrongdoing." Baca, 398 F.3d at 1221. On the other hand, we also have explained that "evidence such as a long delay between the employee's speech and challenged conduct, or evidence of intervening events, tend to undermine any inference of retaliatory motive and weaken the causal link." Maestas, 416 F.3d at 1189 (internal citations omitted).

With regard to the need to show a detrimental employment decision or an adverse employment action as part of the fourth prong of Garcetti, the Supreme Court has noted that First Amendment protection extends beyond employer conduct amounting to termination of employment or the substantial equivalent.

Rutan v. Republican Party of Illinois, 497 U.S. 62, 75 (1990). In Rutan, the

Supreme Court noted that such a limit would "fail to recognize that there are

deprivations less harsh than dismissal that nevertheless press state employees and

applicants to conform their beliefs and associations to some state-selected

orthodoxy."[16] Id. In so doing the Court recognized that promotions, transfers,

recalls after layoff, and hiring decisions are actionable conduct. Id. Likewise,

this court has recognized that certain types of less severe conduct can be the basis

for a First Amendment claim, as we have noted on more than one occasion that

"some forms of retaliation may be actionable under the First Amendment while

insufficient to support a discrimination claim under Title VII." Maestas, 416 F.3d

at 1188 n.5 (citing cases); see also Brammer-Hoelter, 492 F.3d at 1208

(forbidding teachers to speak with parents about school matters and blacklisting

teachers from future employment at the school could be an actionable adverse

employment action for First Amendment purposes); Schuler v. City of Boulder,

189 F.3d 1304, 1310 (10th Cir. 1999) (removing an employee's job duties, issuing

a written reprimand, giving a poor performance evaluation, and transferring an

employee can be actionable in the First Amendment context). But "we have never

ruled that all [of an employer's acts], no matter how trivial, are sufficient to

_____

[16]Although Rutan arose in the political patronage context, it has informed our court's determinations of the scope of actionable retaliation under the First Amendment. See Schuler, 189 F.3d at 1309.

- 20 -

support a retaliation claim." Lybrook v. Members of Farmington Mun. Sch. Bd. of Educ., 232 F.3d 1334, 1340 (10th Cir. 2000).

In Burlington Northern & Santa Fe Railway Co. v. White, 548 U.S. 53 (2006), the Court held that the actionable adverse employment action is broader in the Title VII-retaliation context than in the Title VII-substantive discrimination-context. Id. at 61. Specifically, the Court held that in order for an employer's conduct to be actionable, a plaintiff must show that the conduct "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Id. at 68 (internal quotation and citation omitted). This standard is analogous to our definition of an adverse action in First Amendment retaliation claims against defendants other than the plaintiff's employers. Worrell v. Henry, 219 F.3d 1197, 1212 (10th Cir. 2000) (Plaintiff must establish "that the defendant's actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity." (internal quotation omitted)). Also, this standard is consonant with the Supreme Court's discussion in Rutan that "deprivations" which "press state employees and applicants to conform their beliefs and associations to some state-selected orthodoxy" raise First Amendment concerns. 497 U.S. at 75.

The test in Burlington Northern is also consonant with our First Amendment employment retaliation cases. For instance, just as Burlington Northern held in the Title VII-retaliation context, we have explained that an

adverse action for purposes of retaliation under the First Amendment can be broader than adverse actions in the Title VII discrimination context. <u>Maestas</u>, 416 F.3d at 1182 n.5 (noting that "some forms of retaliation may be actionable under the First Amendment while insufficient to support a discrimination claim under Title VII"). Additionally, the test in <u>Burlington Northern</u> is analogous to the standard articulated by several other circuits in the First Amendment context. <u>See, e.g.</u>, <u>Matrisciano v. Randle</u>, 569 F.3d 723, 730 (7th Cir. 2009) (employee must establish that "he suffered a deprivation likely to deter free speech"), <u>abrogation on other grounds recognized in</u> <u>Fairley v. Andrews</u>, 578 F.3d 518, 525-26 (7th Cir. 2009); <u>Zelnik v. Fashion Inst. of Tech.</u>, 464 F.3d 217, 227 (2d Cir. 2006) (adopting <u>Burlington Northern</u> standard in the First Amendment retaliation context); <u>Nair v. Oakland County Cmty. Mental Health Auth.</u>, 443 F.3d 469, 478 (6th Cir. 2006) (adverse action means "an injury that would likely chill a person of ordinary firmness from continuing to engage in [the protected] activity"). <u>But see</u> <u>Akins v. Fulton County, Ga.</u>, 420 F.3d 1293, 1300-01 & n.2 (11th Cir. 2005) (action must tend to chill free speech and alter some important condition of employment to be adverse; but also observing that the First Amendment and Title VII standards are "consonant").

Therefore, in determining whether Dr. Couch's complaints of retaliation satisfy the fourth <u>Garcetti</u>-prong, we will consider whether the hospital's specific

actions would "deter a reasonable person from exercising his . . . First

Amendment rights." Brammer-Hoelter, 492 F.3d at 1208.

2.      Application of the Prong Four Requirements of Causation and
         Adverse Employment Action to the Allegations in This Case

        a. *2001 Rardin Investigation and Corrective Action*

Dr. Couch asserts that the first Rardin investigation, in 2001, which

occurred shortly after Dr. Couch first raised the issue of a random drug and

alcohol policy, and the Board of Trustee's subsequent letter addressing the

investigation were retaliatory. Under the circumstances here, we conclude that

neither the investigation nor the letter constitute an adverse employment action

for First Amendment purposes.

A reasonable employee would not be deterred from exercising his First

Amendment rights because he was a subject of Rardin's investigation.  As the

Supreme Court explained in Burlington Northern, "[c]ontext matters" in

determining whether an employer's conduct is actionable.  548 U.S. at 69

(explaining that "[t]he real social impact of workplace behavior often depends on

a constellation of surrounding circumstances, expectations, and relationships

which are not fully captured by a simple recitation of the words used or the

physical acts performed" (quoting Oncale v. Sundowner Offshore Servs., Inc.,

523 U.S. 75, 81-82 (1998)).  Here, Rardin's investigation was not just targeted at

Dr. Couch but was focused on both Drs. Couch and Cesko, and was commenced

- 23 -

after the ACOG report had already documented the interpersonal conflicts that existed between the two doctors. Cf. Pierce v. Texas Dept. of Criminal Justice, Inst. Div., 37 F.3d 1146, 1150 (5th Cir. 1994) (holding that investigating an employee, where that investigation did not lead to any adverse action against the employee, is not actionable under the First Amendment).

While Rardin's report and recommendations ultimately led to the Board issuing a letter, dated November 21, 2001, to Dr. Couch, this letter was also not actionable because a reasonable person would not be deterred from speaking as a result of the letter. Although a letter of reprimand may sometimes contribute to an adverse employment action, particularly in the context of other conduct, Dr. Couch has failed to establish that it could be considered adverse action here. Cf. Baca, 398 F.3d at 1221 (reprimand in contravention of employer's protocol in conjunction with other conduct was actionable); Schuler, 189 F.3d at 1310 (written letter of reprimand concerning employee's discussions of protected speech as part of other extensive negative conduct was actionable). Although the letter noted that the investigation revealed "disruptive" behavior, it did not discuss Dr. Couch's advocacy for a random testing policy; instead the letter focused on recommended changes in Dr. Couch's conduct. The recommendations clearly were reasonable since Dr. Couch admitted he already was doing those things. See Lybrook, 232 F.3d at 1341 (mandating a teacher to comply with a professional development plan, meet with her supervisor on a regular basis, and

strive to act professionally towards her colleagues, although unwelcome, "are of insufficient gravity to premise a First Amendment violation").  And Dr. Couch was aware that a similar letter was also issued to Dr. Cesko, who had not engaged in any protected speech.  Thus, a reasonable person would not be deterred from engaging in protected speech as a result of receiving the Board's November 21, 2001 letter and so do not constitute adverse employment action.

Moreover, even if either the investigation or the letter were to constitute an adverse employment action, Dr. Couch has failed to establish that his speech was a motivating factor in causing these actions.  The mere temporal proximity between his speech and the events is insufficient here to establish a retaliatory motive.  The Rardin investigation and resulting Board's actions were directed equally at Dr. Cesko, who did not engage in any protected speech, and Dr. Couch has failed to establish that Rardin or the Board had any reason to retaliate against him for his speech.   Although the Board eventually disagreed with Dr. Couch's proposals, it considered his proposals, and its ultimate decision not to implement Dr. Couch's proposed changes is not sufficient here to infer a retaliatory motive.

b. *Non-reappointment to Medical Staff PA&I Committee*

Dr. Couch also asserts that the hospital's decision in July of 2003, not to reappoint[17] him to his seat on the Medical Staff Performance and Assessment and

_____

[17]Dr. Couch statement that he was "removed" from this committee does not accurately reflect the hospital's action.  The hospital has many committees

(continued...)

- 25 -

Improvement ("PA&I") Committee was actionable. Although Dr. Couch complains about his non-reappointment to the seat on the PA&I committee, he does not explain the importance of the committee, whether a seat on the committee is desirable from an employment perspective, or whether non-reappointment can be considered comparable to a demotion. Cf. Schuler, 189 F.3d at 1309 (removing an important job duty from an employee can be actionable); Baca, 398 F.3d at 1221 (depriving supervisory responsibilities can be actionable). A seat on the committee could just as easily be considered a chore instead of a benefit, and indeed Dr. Couch has had chronic problems of attendance at hospital committee meetings—during the subsequent year his meeting attendance numbers were abysmal, less than twenty percent, and far below the requirements for reappointment of privileges. Indeed, Dr. Couch was absent from the last two PA&I committee meetings before he was not re-appointed. Under these circumstances, Dr. Couch has failed to establish that his non-reappointment to the PA&I committee could have constituted actionable retaliation.

---

[17](...continued)
composed of medical staff, and a condition of privileges at the hospital is at least 50% attendance on appointed committees. Appointments are made for a term, and after the term expires, the hospital is free to appoint another individual to the seat.

- 26 -

c. *Disruptive Conduct Investigation and Resulting Action*

The most significant action taken against Dr. Couch were the restrictions and requirements on Dr. Couch that flowed through investigations and recommendations by the Ad hoc Committee, the Credentials Committee, the Executive Committee and ultimately adopted by the Board of Trustees. Those restrictions and requirements revolved around three major areas of concern: disruptive conduct, billing fraud, and mistreatment of patients.

i. *Ad hoc Committee's Investigation*

First, Dr. Couch asserts that the hospital's investigation and corrective action requirements resulting from Dr. Thomas's disruptive conduct complaint was in retaliation for his filing of a complaint against Dr. Thomas with the WBM. After the hospital's chief of staff Dr. Abel formed an ad hoc committee to investigate Dr. Thomas's report, the ad hoc committee hired Rardin to investigate Dr. Couch's alleged disruptive conduct. Like Rardin's earlier investigation, this investigation was of insufficient gravity to invoke First Amendment protection. The ad hoc committee had no authority over Dr. Couch—it was only created to investigate actions—and the matter was then forwarded to the Credentials Committee, along with the ad hoc committee's report that Dr. Couch's handling of his complaint was inappropriate, because "he did not follow established practices of medical review" and "was not open and honest with Dr. Thomas or the Critical Care Committee" investigating Dr. Thomas's alleged errors.

- 27 -

## ii. *Credentials Committee*

After the Credentials Committee received the ad hoc committee's recommendations, it required Dr. Couch to submit to a mental/psychiatric examination in order for the committee properly to decide on the appropriate further action. In the context of this situation, that requirement did not constitute an adverse employment action. Dr. Couch had documented difficulties getting along with other doctors and staff at the hospital. Indeed, the independent ACOG report, which was solicited before Dr. Couch ever engaged in potentially protected speech, and the first Rardin investigation actually encouraged counseling and anger management. Thus, the requirement for a one-time psychiatric counseling had an understandable context and was minimally invasive because it was only a one-time consultation.[18]

Even if the requirement for a one-time psychiatric evaluation could be considered an adverse action, Dr. Couch has failed to establish that the Credentials Committee's action was retaliatory. The temporal proximity between the request for a psychiatric evaluation and Dr. Couch's complaint with the WBM was eleven months and is tenuous support for an inference of retaliation. Such temporal proximity is insufficient without any other evidence that Dr. Couch's speech was a substantial motivating factor of the Committee's conduct. See

---

[18] It also appears that Dr. Couch may not even have known about the ACOG report or Rardin's recommendations before the Credential Committee's actions.

Maestas, 416 F.3d at 1189 ("temporal proximity is insufficient, without more, to establish such speech as a substantial motivating factor in an adverse employment decision").

Furthermore, because the decision-maker was a committee, Dr. Couch would need to establish that a majority of the members who voted on action were biased or that a biased member was a substantial influence over the committee's ultimate action in order to satisfy his burden to establish causation. The Credentials Committee consisted of Drs. Schulze, Chandra, Cesko, Sridharan, and Smith, and Patsy Carter. Dr. Couch has presented some evidence that Drs. Cesko and Sridharan had alcohol or drug abuse issues, which might suggest why they would want to retaliate against him for his advocacy of a random testing policy. See Maestas, 416 F.3d at 1189 ("Other evidence of causation may include evidence the employer expressed opposition to the employee's speech, or evidence the speech implicated the employer in serious misconduct or wrongdoing.") (citation omitted). However, such a motive is pretty weak since the hospital had already rejected Dr. Couch's proposal and it is doubtful that the physicians would have considered Dr. Couch's speech was a threat to them because the hospital already had indicated that it was concerned about physician privacy by not requiring Dr. Thomas to undergo a drug test after concluding there was not probable cause to suspect that he was using drugs. Dr. Couch's speech thus posed almost no threat to Drs. Cesko and Sridharan and would provide little

motive for them to retaliate. Additionally, Dr. Couch has produced only minimal evidence that Ms. Carter might want to retaliate against Dr. Couch for his speech. While Ms. Carter did indeed voice her dislike for Dr. Couch, he has produced no evidence that her dislike was *because of* his advocacy for random testing policy or because he reported Dr. Thomas to the WBM.[19] Finally and most importantly, Dr. Couch has failed to establish that the other doctors had a motive to retaliate. While they did vote against his random testing policy in 2002, such policy disagreement without more is insufficient to establish a retaliatory motive. And Dr. Couch's insinuation that they were part of an "old boys' club" that would retaliate in order to protect their colleagues lacks any evidentiary support.[20] Therefore, Dr. Couch has failed to provide evidence supporting his claim that the Committee's ultimate action was retaliatory.

For most of the same reasons, Dr. Couch's claim that the Credentials Committee's subsequent action on the disruptive conduct complaint satisfied the fourth prong of Garcetti also must fail. After receiving Dr. Gendel's evaluation,

---

[19]While Dr. Couch has produced evidence that Ms. Carter disliked Dr. Couch, that she thought he was "crazy," and that she mentioned that Dr. Couch had proposed a drug and alcohol testing program, Dr. Couch has not produced any evidence that Ms. Carter disliked Dr. Couch because of his advocacy of the testing program.

[20]Additionally, insomuch as Dr. Couch asserts that other doctors would be motivated to retaliate against him because they were substance abusers, he has failed to present anything more than rumors or innuendos of such substance abuse.

the Committee made several recommendations to the Executive Committee, including that Dr. Couch "be placed on probation," that he be ordered to "undergo psychotherapeutic treatment with a psychiatrist chosen by the Credentials Committee," that he be required to meet with the Credentials Committee every three to six months and present a progress report from the psychiatrist, and that medical staff be informed of the situation and be required to report any disruptive behavior. This recommendation did not constitute an adverse employment action for First Amendment purposes. Under the circumstances here, where the committee's action was merely a recommendation for a higher committee to take certain action, and where the higher committee conducts independent reviews of lower committee's actions, a reasonable person would not be deterred from further speech.[21] Further, even if this could constitute an adverse employment action, Dr. Couch has produced insufficient evidence of causation by the Credentials Committee related to his protected speech for the previously articulated reasons.

### iii. *Executive Committee*

The Executive Committee subsequently approved, on June 2, 2004, all of the Credentials Committee's recommendations, including the probation and psychiatric treatment recommendations, and on January 20, 2005, the Executive

---

[21] Again, it is not clear that Dr. Couch ever knew of the recommendations, and if he did not, they could not serve as a deterrent to a reasonable person.

- 31 -

Committee affirmed this disposition.  While an employer's action placing an

employee on probation and requiring continuing psychiatric treatment would

often be severe enough to constitute adverse employment action, here outside

reviewers had previously recommended these actions and Dr. Couch was able to

appeal these actions before an independent panel.[22]  Cf. Somoza v. University of

Denver, 513 F.3d 1206, 1214 (10th Cir. 2008) ("[T]he fact that an employee

continues to be undeterred in his or her pursuit of a remedy, as here was the case,

may shed light as to whether the actions are sufficiently material and adverse to

be actionable.").  Thus, under the circumstances of this case, we cannot conclude

that the Executive Committee's action would be likely to deter a reasonable

employee from speaking.  In any event, even if the Committee's action could

constitute an adverse employment action, Dr. Couch has failed to establish that

such action was retaliatory.  The members that were present when the Committee

voted on its action were Drs. Chandra and Schulze, and Ms. Carter.  There is no

evidence that any of these committee members were motivated to retaliate against

---

[22]Although Dr. Couch notes that the Executive Committee's decision stated that he was not entitled to appeal the action, Dr. Couch did in fact eventually effectively appeal the Committee's action.  While Dr. Couch might have initially thought that such action was final (as Dr. Couch had notified the WBM that he was placed on probation), this perception, even if true, was not reasonable as the Executive Committee's bylaws clearly indicated that it did not independently have the authority to impose such action on Dr. Couch.  Indeed, Dr. Couch did not treat the Committee's action as inviolate as he subsequently refused to undergo psychotherapeutic treatment as directed by the Executive Committee—and it was after such refusal that the hospital clarified that he had a right to a due process hearing/appeal of the Committee's decision.

Dr. Couch or that the Committee's action was substantially motivated by retaliation, and the rationale for the actions taken by the Executive Committee was well established upon non-retaliation causes.

### d. *Billing Fraud Investigation and Corrective Action*

The next major complaint that was brought to the Board involved Dr. Couch's charting practices and alleged billing fraud. The hospital's investigation on these issues followed a similar pattern to how the hospital dealt with the disruptive conduct complaint: first, the hospital had an independent reviewer investigate the allegations, second, the credentials committee made a recommendation, and then the executive committee considered the matter.

An investigation of potential misconduct, as already noted, will generally not constitute an adverse employment action. Here, the hospital has a legitimate interest in assuring its physicians accurately billed their services (indeed at least two patients complained about Dr. Couch's bills), and the hospital's solicitation of an independent reviewer, MPQHF, to evaluate patient records that had mostly been brought to the hospital's attention because of patient complaints about Dr. Couch's billing practices would not deter a reasonable person from further potential speech. In a highly regulated area like hospital billings and record keeping, it can hardly be considered an adverse employment action that the hospital would take steps to guarantee the accuracy and integrity of those practices.

MPQHF's reviewers agreed with the hospital's suspicions that Dr. Couch might have billed for services he did not perform, and the hospital subsequently implemented MPQHF's recommendations, including reporting Dr. Couch's action to the WBM and requiring Dr. Couch to received thirty hours of training on proper coding and charting. The reporting of Dr. Couch to the WBM and its request that Dr. Couch enroll in training for proper coding and charting, under these circumstances, would not deter a reasonable person from speaking or a protected topic because this investigation was well grounded on reasons unrelated to Dr. Couch's protected speech. However, even if these requirements could constitute adverse employment action, the fact that the hospital's action merely implemented recommendations of an independent outside reviewer undermines any inference that the action was motived by retaliation. See Deschenie v. Bd. of Educ. of Cent. Consol. Sch. Dist. No. 22, 473 F.3d 1271, 1278 (10th Cir. 2007) ("An inference of retaliatory motive may be undermined by . . . evidence of intervening events." (quotations omitted)).

Likewise, for much the same reasons, when the Credentials Committee determined that Dr. Couch's attendance in a practice management course did not fulfill the proper course training requirements, and forwarded the matter to the Executive Committee, Dr. Couch failed to establish that the Executive Committee's actions — suspending Dr. Couch from call rotation for unassigned patients until he attended the proper thirty hours of training requirements —

constituted an adverse employment action or that this decision was motivated by retaliation.

e. *Patient Mistreatment Investigation and Corrective Action*

The final general issue that ultimately was considered by the Board involved Dr. Couch's alleged mistreatment of several patients. The Medical Staff PA&I Committee, after reviewing medical records for several patients, and specifically the medical records of patient Corrine Klewin, requested Dr. Couch to attend continuing medical education training. Dr. Couch was already required to take continuing medical education classes in order to maintain his license to practice medicine,[23] and the PA&I Committee's specification of a particular class as a result of its review of Dr. Couch's treatment did not constitute an adverse employment action. Especially in light of the fact that Dr. Couch has admitted that it was appropriate for the hospital to look into his care and treatment of these patients. Again, even if we were to conclude that the action was of sufficient severity to invoke First Amendment protection, Dr. Couch failed to establish causation. Dr. Couch failed to establish that a majority of the members of the PA&I committee had a retaliatory motive. And the fact that an independent review of Klewin's death noted that Dr. Couch's treatment of Ms. Klewin did not

---

[23]Wyoming Board of Medicine's Rules and Regulations, Chapter 3, Section 6(a), requires a physician to satisfactorily complete not less than sixty hours of continuing medical education in order to renew his or her license to practice medicine in Wyoming.

focus on the main cause of her death undermines any inference of retaliation.  See

Deschenie, 473 F.3d at 1278.  While Dr. Couch is correct that the Critical Care

Committee had previously initiated a review of Klewin's death two years earlier,

the fact that the hospital revisited the issue two years later, without any additional

evidence, is insufficient to establish that the request for training on the cause of

death of a patient under Dr. Couch's care was motivated by retaliation.

f. *The Board's October 23, 2006 Decision*

The Board's October 23, 2006 decision was the culmination of all of the

hospital's prior actions discussed supra, including the charges of disruptive

conduct, charting and billing practice errors, inappropriate care and mistreatment

of several patients, and the Credential Committee's recommendation to deny Dr.

Couch's reappointment to the medical staff.  The Board's decision, which was

made after receiving recommendations from a three-person independent panel,

reappointed Dr. Couch to the medical staff but nonetheless mandated several

conditions for Dr. Couch's future employment that arguably might have

constituted adverse employment action.[24]  However, even here, the fact that these

---

[24] The Board's final decision required that (1) Dr. Couch be evaluated by a mutually agreed-upon psychiatrist; (2) Dr. Couch to properly follow-up on any recommendations made by the psychiatrist; (3) Dr. Couch to "make a documented good faith effort to improve relations" with MHCC staff and doctors; (4) Dr. Couch to attend his committee meetings; (5) Dr. Couch to "demonstrate competence in Diabetic Ketoacidosis management"; and (6) Dr. Couch's privilege to continue practicing at MHCC was "conditionally granted subject to the foregoing terms."

actions all are well grounded on factors unrelated to Dr. Couch's alleged

protected speech undercut the claim that, under these circumstances, this action

would reasonably deter protected speech.

Nonetheless, Dr. Couch has again failed to establish that his speech might

have been a substantial motivating factor for the Board's action. The Board's

decision was reached after retaining and reviewing the report of an independent

panel of reviewers, who heard four days of evidence. This independent, unbiased

investigation of Dr. Couch's conduct removes any taint of bias that otherwise

could have existed. Cf. E.E.O.C. v. BCI Coca-Cola Bottling Co. of Los Angeles,

450 F.3d 476, 485 (10th Cir. 2006) (decisionmaker's use of an independent

investigation can remove taint from subordinate's bias). Dr. Couch has failed to

produce evidence that the Board had an improper motive; while Dr. Couch has

produced evidence of a policy disagreement, the fact that the Board rejected Dr.

Couch's random testing proposal almost four years prior, without more, is

insufficient evidence of bias. Dr. Couch has failed to offer that something more,

and his claims of retaliation consequently fail.

3.      Garcetti's Prong Five — Employer Would Have Taken Same Action
        Against The Employee in the Absence of the Protected Speech

The Defendants also have established that alternate grounds under the fifth

prong of Garcetti that they would have taken the same actions against Dr. Couch

even in the absence of Dr. Couch's speech. See Brammer-Hoelter, 492 F.3d at

1203. As already noted, the hospital's actions followed a familiar course of proceedings: independent outside review and then internal review, recommendations, and corrective action to address issues documented by the outside review. Here, the hospital responded appropriately to serious allegations concerning interpersonal employee conflicts, billing fraud, and inadequate patient care. The hospital's investigations were entirely appropriate; and the hospital's corrective actions were reasonable and based on the recommendations of those investigations. Therefore, the defendants have established the fifth Garcetti prong.

## III. CONCLUSION

For the foregoing reasons, we AFFIRM the district court's grant of summary judgment for the defendants.[25]

---

[25]The court's business is public business and, therefore, we DENY the parties' motions to seal both the record on appeal and their briefs.

08-8001 - *Couch v. Board of Trustees*

**HARTZ**, Circuit Judge, concurring:


I concur in the result and join Judge Ebel's opinion.  I write separately to emphasize one point.  The opinion does not say that requiring an employee to see a psychiatrist or to take a 30-hour training course can never be an adverse employment action under the *Pickering/Garcetti* test.  Indeed, I would think that the prospect of either requirement by an employer would generally deter people of ordinary firmness from speaking out.  In the specific context of this case, however, those impositions on Dr. Couch were not adverse employment actions.