FILED
United States Court of Appeals
Tenth Circuit

September 13, 2010

Elisabeth A. Shumaker
Clerk of Court

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

TOMMY RAY HOOK,

    Plaintiff,

CHARLES MONTAÑO,

    Plaintiff and Counter-Claim
    Defendant-Appellant,

v.

REGENTS OF THE UNIVERSITY OF
CALIFORNIA, d/b/a Los Alamos
National Laboratory,

    Defendant-Counter-Claimant,

and

RICHARD MARQUEZ; JOHN
BRETZKE; PATRICK REED;
WILLIAM BARR; BANI
CHATTERJEE; DEBBIE LYNN
BROWN, as Personal Representative
of the Estates of Vernon Brown,

    Defendants-Appellees.

No. 09-2102

(D.C. No. 1:05-CV-00356-JCH-WPL)
(D. N. Mex.)

**ORDER AND JUDGMENT**[*]

---

[*] This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. It may be cited,
however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th
Cir. R. 32.1.

Before **BRISCOE,** Chief Judge, **EBEL,** and **HOLMES**, Circuit Judges.

---

Plaintiff-Appellant Charles Montaño appeals the district court's grant of summary judgment to Defendants-Appellees Bani Chatterjee, Patrick Reed, Richard Marquez, John Bretzke, Vernon Brown, William Barr, and the Regents of the University of California, on Montaño's claims of First Amendment retaliation under 42 U.S.C. § 1983, and his claims under the California Whistleblower Protection Act ("CWPA"), Cal. Gov't Code §§ 8547 to 8547.12. Montaño also appeals the district court's evidentiary ruling that struck a substantial portion of his summary judgment submissions. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

I.     BACKGROUND

Montaño began working for the Los Alamos National Laboratory ("LANL" or "the Lab") in 1978, and he claims that during his tenure as a Lab auditor, several members of upper management retaliated against him for his public advocacy. Montaño claims that he experienced retaliation when he worked under the supervision of Chatterjee, and that he also experienced retaliation when he later worked under the collective direction of Marquez, Bretzke, Brown, and Barr. Finally, Montaño claims that Reed, as University Auditor for the University of California ("the University"), also retaliated against him.

A.     Introduction

2

At the time of the events in question, the University operated the Lab pursuant to a contract with the United States Department of Energy ("DOE"). Part of the responsibility for ensuring compliance with the DOE contract resided with the Lab's internal audit function. By 1994, Montaño was working within the internal audit function under the supervision of Tommy Hook, who in turn reported to Katherine Brittin.

At that time, Montaño became outspoken about the "illegal billing of costs to the DOE contract, and related financial illegalities," and he made "repeated disclosures to DOE officials and to the New Mexico Congressional delegation." J.A. at 644-45. Montaño was also outspoken about employment discrimination, and became the founding president of Citizens for LANL Employee Rights, a diverse group of employees that included many who had been laid off by the Lab. Montaño claims that his auditing work and public advocacy raised the ire of Katherine Brittin, who engaged in a series of retaliatory acts against Montaño, Hook, and other auditors. Montaño contacted Patrick Reed, informed him about the internal audit group's difficulties with Brittin, and requested that he intervene. Reed, however, took no action.

Montaño compiled some of these alleged acts of retaliation into a whistleblower complaint that he filed with the DOE in 1996. By 1999, the Department of Energy Inspector General ("DOE IG") issued a report concluding that some of the Lab's actions taken against Montaño were in retaliation for his

3

public advocacy. Montaño eventually settled his whistleblower complaint with the Lab; as part of the settlement agreement, the Lab appointed Montaño "as a Project Leader in the BUS-1 group . . . in the BUS Division."[1] Id. at 649.

B.    Chatterjee

In February 2002, Montaño accepted BUS-1 Group Leader Mary Erwin's request to become the acting "Team Leader for the General Accounting and Work for Others Team." Id. at 650. Shortly after Montaño became acting Team Leader, Erwin resigned her post as BUS-1 Group Leader and Lab officials solicited applicants to replace her. Montaño applied, but did not receive an interview. The Lab awarded the position to a woman named Bani Chatterjee. Id.

Shortly after Chatterjee became BUS-1 Group Leader, she opened up for competition the Team Leader position then occupied by Montaño in an "acting" capacity. Montaño was not Chatterjee's first choice. However, Richard Marquez, who was the Lab's Associate Director for Administration, directed Chatterjee to offer Montaño the position. Id. at 212, 217.

Montaño alleges that throughout the course of his application for and tenure as Team Leader, Chatterjee engaged in a campaign of retaliatory behavior, aimed

_____

[1] "Although neither side in this lawsuit has explained the managerial hierarchy at LANL," J.A. at 1056, from what we can discern, at this stage the Lab was divided into at least two divisions, one of which was the BUS Division, which was responsible for general business operations, included auditing. As we explain, the organizational structure of the BUS Division was fundamentally altered in 2003.

at paying Montaño back for his previous whistleblowing activities and silencing any of Montaño's potential future whistleblowing activities. For instance, Montaño claims that Chatterjee retaliated against him because of his legislative testimony in October 2002. As "chairperson of the Hispanic Round Table of New Mexico[,] . . . a consortium of some forty member organizations," Montaño testified before a joint New Mexico-California legislative committee that the Lab was in violation of anti-discrimination laws, and the Lab had refused to release a report on pay disparity.[2] Id. at 652-53.

Montaño contends that Chatterjee engaged in the following retaliatory conduct: (1) even after Marquez instructed Chatterjee to offer Montaño the Team Leader position on a permanent basis, Chatterjee attempted to dissuade Montaño from accepting the job by asking him if he "still wanted the job," and warning him that it was "not a promotion, had long hours, and would have no pay raise," id. at 651; (2) during the course of Montaño's tenure as Team Leader, Chatterjee consistently denigrated him in front his team members, harassed him by frequently asking him to explain certain accounting concepts, and warned him not to "keep airing our dirty laundry for the world to see," id. at 651; and (3) in October 2002, Chatterjee prepared what Montaño characterizes as a "retaliatory

_____

[2] Marquez also testified at that hearing, and explained that the pay disparity study was ongoing, and that the Lab would release the results upon completion. After the hearing, "Marquez glared angrily" at Montaño, and refused to speak to him. J.A. at 653.

5

performance evaluation" of Montaño's work during the 2003 fiscal year,[3] id. at 499, 652.

According to Montaño, Chatterjee's campaign of retaliatory behavior made his work conditions so intolerable that he eventually sought to find another position, away from Chatterjee's supervision. Id. at 655-56. Indeed, Montaño e-mailed Marquez in November 2002, complaining about Chatterjee's management style and suggesting that perhaps Marquez should re-assign Montaño to another position within the Lab. Id. at 810-11. Although Marquez did not intervene, by March 2003, Montaño had found another position at the Lab, working under Hook in the newly created Self Assessment Procurement Review ("SAPR") Team.

During the course of his tenure with the SAPR Team, in August 2004, Montaño alleges that Chatterjee took her final retaliatory action against him by disconnecting his computer from a color printer located in her group's work area. Id. at 665. For her part, Chatterjee contends that she disconnected Montaño's computer in response to a request from LANL security that she limit access to her

---

[3] Although the evaluation can be construed, in part, as critical of Montaño's performance, Chatterjee indicated that Montaño's "[p]roject [leader] assignments were all performed in a satisfactory manner," and that "[h]is work on internal controls . . . was thorough and brought a tremendous amount of credibility with DOE." J.A. at 221. She also gave Montaño an ORC (unexplained term/scale) score of 6.5, id., which was 0.5 higher than the ORC score Montaño was given in his "FY 2002" evaluation, id. at 229. Moreover, pursuant to Chatterjee's "FY 2003" review, Montaño was awarded an annual raise of $2,250, id. at 225, which was $50 more than the raise Montaño received following his "FY 2002" review, id. at 226.

work area to those with a business need.  Id. at 219.

      C.      Marquez, Bretzke, Brown, and Barr, and Reed

While Montaño was working under Chatterjee's supervision in 2002, the Lab's internal auditing and security functions came under increasing public scrutiny.  See id. at 736.  As part of its response, the Lab hired Glenn Walp and Steven Doran in early 2002 to head up the Office of Security Inquiries.  Id. at 688-89, 732-34.  Walp and Doran discovered many issues with the Lab's internal security; however, both men were fired after less than one year on the job.  Id. at 688-89, 732-34, 814-16.  Their terminations were detailed in an Albuquerque Journal article published on December 4, 2002.  The article also made numerous references to, and contained numerous quotations from Montaño and his former, and soon to be again supervisor, Tommy Hook.  Id. at 814-16.

In January 2003, as another part of its response to this increased scrutiny, the Lab tasked Hook with creating the aforementioned Self Assessment and Procurement Review Team ("SAPR").  Id. at 655.  SAPR was meant to be an "independent program" within the BUS Division, "which initially reported directly to the BUS Division Leader."  Id. at 599.  SAPR was responsible for auditing, reviewing, and assessing that division's finance and procurement operations.  Id.  By March 2003, Hook had hired Montaño to join SAPR.

Montaño's remaining allegations of retaliation center upon the work he performed, and the lack of work he later received, while working within SAPR.

7

According to Montaño, by April 2003, Marquez and other management retaliated against SAPR by "remov[ing] finance issues from [SAPR] . . . and limit[ing] our work to procurement problems," and also by "downgrad[ing] Mr. Hook's reporting relationship . . . ." Id. at 656. By May 2003, "management announced another initiative, the Business Process Improvement Program ('BPIP'), which they publicly proclaimed as 'validation' that all problems were being resolved." Id. And by July 2003, Montaño claims that "senior Lab management 'buried' [SAPR] through a bureaucratic reorganization." Id. at 657.

The bureaucratic reorganization that occurred during this time was Marquez's decision to restructure the BUS Division by splitting it into two separate divisions: one division, the Chief Financial Officer (CFO) Division, "manage[d] the Lab['s] Accounting and Budgetary functional areas;" the other division, the Supply Chain Management (SUP) Division, "manage[d] the Lab['s] Procurement, Property and Material Management functional areas." Id. at 474. Many layers of management existed within SUP. John Bretzke was the Division Leader within SUP. Bretzke selected Vernon Brown "to fill the Group Leader position in SUP-1 on an acting basis." Id. at 436-37. William Barr was the "Project Leader for Procurement Quality Assurance." Id. at 437. Though the exact hierarchy of these layers is unclear, what is clear is that Barr was the "direct supervisor for SAPR," and "was responsible for assigning projects to the SAPR Team, usually at the direction of . . . Vernon Brown." Id. at 489. According to

8

Montaño, this restructuring was detrimental to SAPR's independence because the entity "went from being a division-level activity, to being a project within a team, within a group, within a division." Id. at 657.

SAPR's "primary mandate" following this restructuring "was to prepare a FY 2003 self-assessment report for all procurement programs by October 20, 2003." Id. at 658. Despite this assignment, Montaño claims that management obstructed SAPR's efforts to complete the report, and ten days before its release management "sent DOE the Lab's 'Management Representation Letter,' which falsely claimed that the BPIP process had made significant improvements in the Lab's procurement activities, [and] that there were 'no significant discrepancies' and no unallowable costs." Id. at 660. SAPR's report, in contrast, "gave procurement a failing grade," and detailed numerous procedural problems. Id. But "[t]he Lab never transmitted the SAPR report to DOE in 2003." Id. at 661.

According to Montaño, "[f]rom November 2003 onward, management gave essentially no work to the SAPR Team." Id. Management began "stripping the SAPR Team of [its] primary responsibilities," and in December 2003, Barr removed "the pre-award audit function . . . which left [SAPR] with no meaningful work." Id. Marquez met with Hook and Montaño in January 2004, and explained that he was taking control of SAPR. Id. at 662. But SAPR still "remained with no work." Id. For instance, Tony Pace, who had recently replaced Barr, told Hook and Montaño in February 2004 that SAPR "would no longer do self-

9

assessments, which was [SAPR's] primary mission." Id.

Montaño began looking for work, and he unsuccessfully applied for the "Internal Audit Group Lead position" in January 2004. Id. On March 9, 2004, Montaño "filed a 'hotline' complaint with the DOE IG" for retaliation arising from the removal of work and suppression of SAPR reports, and after filing this complaint, Montaño gave the DOE IG "the data that was in the SAPR Team's October 20, 2003 reports." Id. at 792. Hook and Montaño "again raised concerns about SAPR's increasingly limited role" during meetings with Marquez later that month, but to no avail. Id. at 664.

According to Marquez, he spoke to the "acting Chief Financial Officer . . . about a position for Montaño and in April 2004, CFO employees . . . offered Montaño the opportunity to join CFO and negotiated with him about the terms of the position for the next four months." Id. at 476. Montaño's transfer to the CFO Division was effective August 27, 2004. Before it occurred, Montaño was quoted in a July 25, 2004 Los Angeles Times article that reported on the Lab's dysfunctional "'Cowboy Culture.'" Id. at 838-40. The article noted that Montaño had sat idle for approximately eight months and that he "passe[d] time surfing the Web[,] . . . reading newspapers . . . [and] begging for an assignment that might justify his $82,000 salary." Id. at 840.

Montaño was unsatisfied with his transfer. He claims that he was first told he would serve as a "Project Leader for CFO Division recruitment, mentoring,

10

and training," but he was ultimately reassigned as a "recruiter of accounting and finance staff," what he calls "a mere lateral move with no salary increase and no leadership responsibilities." Id. at 666-67. Thus, when the Internal Audit Group Lead position reopened in September of 2004, Montaño once again applied. This time, while his application was pending, he asked Reed to intervene on his behalf "to prevent continuing retaliation." Id. at 663. Reed, however, did not intervene.

Montaño had, however, also previously reached out personally to Reed. Indeed, in both January 2003 and twice in April 2004, Montaño e-mailed Reed in order to voice his concerns about the internal audit function at the Lab and to request a face-to-face meeting with Reed. Id. at 833-37. It appears that Reed never responded to any of Montaño's communications.

In September 2004, Montaño and Hook filed a whistleblower retaliation complaint with the University. On October 15, 2004, Montaño and Hook testified before the New Mexico legislature. Id. at 668. As the Albuquerque Journal detailed in a series of articles published the following day, Montaño and Hook pressed for a Congressional hearing on whistleblower retaliation at the Lab, and the two detailed the retaliation they allegedly had experienced, including the period of months that Montaño was without work. Id. at 844-46.

D.    Procedural History

In March 2005, Montaño and Hook filed suit against the University and several members of Lab management in New Mexico state court. The defendants

11

removed the case to federal court and asserted a counterclaim against Montaño for breach of the settlement agreement that resolved Montaño's 1996 whistleblower complaint. Hook and Montaño then filed an amended complaint against the University, Chatterjee, Reed, Marquez, Bretzke, Brown, and Barr, asserting CWPA claims against every defendant, and asserting claims for First Amendment retaliation under § 1983 against all six members of Lab management. Montaño and the University then moved for summary adjudication of the counterclaim.

Before discovery was complete, Chatterjee moved for summary judgment on the claims asserted against her; Reed separately moved for summary judgment on the § 1983 claims asserted against him; and Marquez, Bretzke, Brown, and Barr collectively moved for summary judgment on all claims asserted against them. Every defendant sought qualified immunity on the § 1983 claims. The plaintiffs opposed these motions, and attached several submissions, including their own lengthy affidavits, affidavits from other Lab employees, including Walp, as well as transcripts from unsworn interviews and notes describing the content of other interviews conducted during the investigation of plaintiffs' whistleblower complaints. In response, the defendants moved to strike several portions of Hook's and Montaño's affidavit, and also moved to strike in their entirety the Walp affidavit and the interview transcripts and interview notes.

The district court resolved this case by issuing several memorandum opinions and orders. On March 6, 2007, the district court granted the University

12

summary judgment on its counterclaim for breach of the settlement agreement, but did not decide the amount of damages the University was entitled to receive. On March 29, 2007, the district court resolved the defendants' motion to strike. The district court excluded the interview transcripts and interview notes, as well as the Walp affidavit. The district court also concluded that Hook's and Montaño's affidavits were rife with inadmissible testimony, but advised the parties that it would simply ignore those inadmissible portions when rendering its decision. In that same memorandum opinion and order, the district court also granted Chatterjee summary judgment on all claims against her, in part concluding that Chatterjee was entitled to qualified immunity.

In a separate memorandum opinion issued that same day, the district court also granted Reed summary judgment on the § 1983 claims, concluding that Reed was entitled to qualified immunity. Reed then moved for summary judgment on the CWPA claims, and on March 31, 2008, the district court granted Reed summary judgment on those claims. On August 20, 2008, the district court granted summary judgment to Marquez, Bretzke, Brown, and Barr on the § 1983 claims, concluding that those defendants were entitled to qualified immunity, but denied those defendants summary judgment on the CWPA claims. On March 29, 2009, the district court declined to exercise supplemental jurisdiction over two issues that had yet to be resolved in this case—the amount of damages the University could recover on its counterclaim, and the remaining CWPA claims

13

against Marquez, Bretzke, Barr, Brown, and the University—and remanded those issues to New Mexico state court. Montaño timely filed a notice of appeal, challenging the district court's resolution of his § 1983 claims for First Amendment retaliation, and his CWPA claim against Reed.[4]

## II. JURISDICTION

While Montaño's appeal was pending, we sua sponte questioned our appellate jurisdiction because it did not appear that the district court orders Montaño was appealing were "final or immediately appealable decisions under 28 U.S.C. § 1291 or under any recognized exception to the final judgment rule." Order at 2. We therefore directed the parties to "file . . . a copy of a district court order containing a final judgment under Fed. R. Civ. P. 54(b) . . . as to the district court orders disposing of claims for relief . . . . [o]r . . . file a district court order explicitly resolving all claims against all remaining parties." Id. (citation and emphasis omitted).

The defendants filed a responsive memorandum arguing that "even in the absence of a certification pursuant to Rule 54(b) . . . [the court had] jurisdiction over some but not all aspects of the appeal." Aplee. Resp. to Order at 2. Specifically, the defendants argued that despite the district court's remand of certain claims to the state court—the appropriate amount of damages to be awarded on the University's counterclaim and the CWPA liability of all

---

[4] Hook did not further pursue his claims.

14

defendants except Chatterjee and Reed—we retained jurisdiction over the district court's grant of summary relief on the claims which were not remanded. Montaño also filed a responsive memorandum essentially agreeing with the defendants' assertions. We agree with the parties that we have jurisdiction to decide the issues appealed.

A district court order which stops short of adjudicating all claims and liabilities of all parties is not final and appealable unless it is certified under Fed. R. Civ. P. 54(b). See Atiya v. Salt Lake County, 988 F.2d 1013, 1016 (10th Cir. 1993). In the instant case, however, because the district court remanded to state court all claims which its orders did not fully adjudicate, its grants of partial summary judgment, taken together, adjudicated all claims and liabilities of all remaining parties. Accordingly, we have jurisdiction to hear Montaño's appeal, even in the absence of a Rule 54(b) certification. See Porter v. Williams, 436 F.3d 917, 920 (8th Cir. 2006) ("When the district court remanded the remaining . . . claims . . . it had nothing left to resolve and the partial summary judgment became final. Therefore, th[e] court [of appeals] has jurisdiction of the appeal."); Baker v. Kingsley, 387 F.3d 649, 653 (7th Cir. 2004) ("Where . . . a district court has resolved all federal claims and has remanded the remaining claims to state court, we have appellate jurisdiction to review the federal claims, the district court having nothing of the matter left on its docket.").

15

III.   MOTION TO STRIKE

Montaño first argues that the district court erred in striking several of his summary judgment submissions. Montaño contends that the district court erred in excluding the transcripts and interview notes and the Walp affidavit. He also contends that the district court abused its discretion in resolving the evidentiary objections to the affidavits that he and Hook submitted. We review the district court's exclusion of evidence at summary judgment for an abuse of discretion. Johnson v. Weld County, Colo., 594 F.3d 1202, 1207 (10th Cir. 2010).

A.   Interview Transcripts and Interview Notes

Montaño submitted transcripts and interview notes that were part of "the University's internal investigation of [Hook's and Montaño's] whistleblower claims." Aplt. Br. at 21. To investigate these whistleblower claims, an attorney interviewed current and former Lab employees. Some interviews were transcribed by court reporter, while others were memorialized by notes describing the interviewees' statements. See J.A. at 576, 579, 585, 670. Lab counsel participated in some of these interviews. Aplt. Br. at 22; see, e.g., J.A. at 544.

In the district court, Montaño argued this evidence was admissible because "the transcripts and notes constitute business records, and the statements contained therein are non-hearsay party admissions." J.A. at 954-55. But Montaño did not identify how this evidence met the requirements of the business record exception under Federal Rule of Evidence 803(6), see id. at 940-42, and

16

the district court rejected this argument because "[p]laintiffs make no attempt to meet their burden to show that the exhibits meet each of [Rule 803(6)'s] requirements; instead [p]laintiffs simply declare the interview notes and transcripts to be business records," id. at 1043.

On appeal, Montaño contends that the transcripts and interview notes satisfy the requirements of the business records exception because they were conducted by an attorney pursuant to the University's whistleblower policy. To qualify as a business record under Rule 803(6), a piece of evidence must

> (1) have been prepared in the normal course of business; (2) have been made at or near the time of the events it records; and (3) be based on the personal knowledge of the entrant or of an informant who had a business duty to transmit the information to the entrant. To have been prepared in the normal course of business, the memorandum must have been made in the regular course of business of a regularly conducted business activity; and it must have been the regular practice of that business to have made the memorandum. Even if a document is found to meet all three requirements, it can be excluded if the source of information or the method or circumstances of preparation make it untrustworthy.

Hertz v. Luzenac Am., Inc., 370 F.3d 1014, 1017 (10th Cir. 2004) (citations, internal quotations, and alterations omitted). Apart from stating that the investigation of the whistleblower complaint was required by University policy, Aplt. Reply at 3, Montaño makes no foundational showing that the transcripts and interview notes were made "in the regular course of business of a regularly

17

conducted business activity."[5] <u>Hertz</u>, 370 F.3d at 1017 (internal quotation marks omitted). In fact, the differing manner in which the interviews were conducted belies any finding of regularity. Montaño also has not explained how these transcripts and interview notes are more trustworthy than documents prepared in anticipation of litigation, which do not qualify as business records. <u>Timberlake Constr. Co. v. U.S. Fidelity & Guar. Co.</u>, 71 F.3d 335, 342 (10th Cir. 1995).

Montaño also neglects to address the multiple layers of hearsay contained in the transcripts and interview notes. Each interview contains at least two statements: the recording of each interview, and the underlying content. Qualifying these pieces of evidence as business records only solves the first layer of hearsay; Montaño makes no effort to explain how the record of each interview would also be admissible for its truth.[6] The district court did not abuse its discretion in excluding this evidence.[7]

---

[5] Montaño cites to the University's current Whistleblower Policy, but does not demonstrate how the current policy compares to the one in existence at the time these events occurred. Aplt. Reply at 3 n.2.

[6] The district court did rule that Chatterjee's and Marquez's interviews were admissions by a party opponent when offered against the respective interviewees, and neither side asks us to disturb this ruling on appeal.

[7] Montaño also contends that we may consider this evidence because Rule 56(c) permits us to consider "the discovery and disclosure materials on file." Fed. R. Civ. P. 56(c). But the case he cites, <u>Anderson v. Cramlet</u>, 789 F.2d 840, 845 (10th Cir. 1986), concerns the authentication of documents produced during discovery, and therefore does not address the inadmissible hearsay existing within the interview transcripts and interview notes. <u>See</u> <u>Law Co., Inc. v. Mohawk</u>

(continued...)

18

B.    Walp Affidavit

Montaño also submitted the affidavit of Glenn Walp, who the University hired as Office Leader of the Office of Security Inquiries in January 2002. Walp stated that the Lab came under intense scrutiny from the DOE at that time, and as Walp began identifying "major theft problems" within the Lab, his supervisors "did everything they could to thwart [his] investigations . . . ." J.A. at 688-89. Walp further stated that the Lab fired him in November 2002, and that he later testified before Congress concerning the Lab's mismanagement. Id. at 690-91. The district court struck this affidavit in its entirety because it was "totally irrelevant," and "rife with inadmissible hearsay, as Walp recounts the statements of non-parties, the content of newspaper articles, the content of unattached DOE reports, and his own statements at a Congressional hearing." Id. at 1045.

On appeal, Montaño contends that Walp's affidavit was relevant "to show that defendants were on notice of significant problems at the Lab, and that Congress and DOE were actively investigating those problems." Aplt. Br. at 25. Walp's affidavit is relevant for this purpose, but it was not an abuse of discretion for the district court to exclude it. Montaño does not address the district court's

[7](...continued)
Constr. & Supply Co., 577 F.3d 1164, 1170 (10th Cir. 2009) (citing Anderson for the proposition that "[w]e do not require an affidavit to authenticate every document submitted for consideration at summary judgment").

remaining rationale for excluding the affidavit—that it was rife with hearsay.[8]

And Montaño's affidavit already explains how the Lab hired Walp and his

subordinates "to control the negative publicity and increased scrutiny arising from

the Lab's severe mismanagement." Id. at 654.

C.    Montaño's and Hook's Affidavits

In opposing the defendants' motions for summary judgment, Montaño and

Hook submitted lengthy affidavits that described, in narrative fashion, the events

underlying their retaliation claims. Each affidavit referenced several documents,

such as newspaper articles, whistleblower complaints, and Lab documents, but

none of these documents was attached to either affidavit. In subsequent summary

judgment oppositions, the plaintiffs submitted supplemental affidavits that

attached many of the documents referenced in their initial affidavits.

In their motion to strike inadmissible evidence, the defendants argued that

the district court should strike large portions of Hook's and Montaño's affidavits

because of hearsay, irrelevant facts, allegations not based on personal knowledge,

conclusory statements, and improper argument. The defendants also argued that

the district court should strike each affidavit's references to the unattached

documents.

---

[8] Montaño only contends, in conclusory fashion, that the affidavit
"referenced and described public records, *i.e.*, Congressional testimony and DOE
reports" which would be admissible as public records under Federal Rule of
Evidence 803(8). Aplt. Br. at 25.

In ruling on the motion to strike, the district court explained that Hook's and Montaño's initial affidavits "contain[ed] a significant amount of inadmissible testimony," but refused to "engage in a sentence by sentence analysis of the challenged affidavits . . . as that analysis could ultimately be longer than the affidavits themselves." Id. at 1045-46. Instead, the district court advised the parties that the inadmissible portions "have been ignored," and that the parties could discern the contours of its evidentiary ruling from its discussion of the summary judgment motions. Id. at 1047. The district court also struck the references to unattached documents that were contained in each affidavit because of improper authentication.

On appeal, Montaño assails the district court's "unspecified ruling" as an abuse of discretion, and devotes a substantial portion of his briefing to demonstrating how key portions of his affidavit contain admissible evidence. Aplt. Br. at 26. But like the district court, we will not sift through the substance of Montaño's and Hook's affidavits sentence by sentence and determine which portions are admissible. Instead, we focus on the fundamental inquiry at the summary judgment posture, which is "determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). And in doing so, we will consider all of the evidentiary material

21

contained in each affidavit, and the remainder of the accompanying documentation contained in the record. Cf. 10B Charles Alan Wright et al., Federal Practice and Procedure § 2738, at 328-29 (1998) ("The erroneous admission or exclusion of an affidavit that does not meet the Rule 56(e) standard does not require the reversal of a summary judgment if the error is harmless."). Of course, because "[c]onclusory statements in affidavits opposing a motion for summary judgment are not sufficient to raise a genuine issue of material fact," First Commodity Traders, Inc. v. Heinold Commodities, Inc., 766 F.2d 1007, 1011 (7th Cir. 1985), we will disregard the conclusory allegations that appear in each affidavit, such as Montaño's frequent complaints that he was "retaliated against," and the ongoing comparisons he makes between his qualifications and those of other job applicants.

IV.    FIRST AMENDMENT RETALIATION

"We review de novo the district court's grant of summary judgment, applying the same standards used by the district court." Couch v. Bd. of Trs. of Mem'l Hosp., 587 F.3d 1223, 1235 (10th Cir. 2009). Summary judgment is only appropriate if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(c). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Liberty Lobby, 477 U.S. at 255. Because this case

22

concerns the First Amendment, we must "examine the whole record to assure that the district court's judgment does not constitute a forbidden intrusion on the field of free expression." Couch, 587 F.3d at 1235 (internal quotations omitted).

The defense of qualified immunity "protects a government official from personal liability and the burden of having to go to trial unless he violated clearly established statutory or constitutional rights of which a reasonable person would have known." Brammer-Hoelter v. Twin Peaks Charter Acad., 602 F.3d 1175, 1184 (10th Cir. 2010) (citation and quotation omitted). To defeat the defense of qualified immunity, a plaintiff must show that the defendants' actions (1) "violated a constitutional or statutory right" and (2) the right the defendants violated was "clearly established at the time of the conduct at issue." Id. (citations and quotations omitted). We apply a five-prong analysis to determine whether action taken against an employee constitutes retaliation in violation of the employee's First Amendment rights. As we have previously summarized,

> First, the court must determine whether the employee speaks pursuant to his official duties. If the employee speaks pursuant to his official duties, then there is no constitutional protection because the restriction on speech simply reflects the exercise of employer control over what the employer itself has commissioned or created. Second, if an employee does not speak pursuant to his official duties, but instead speaks as a citizen, the court must determine whether the subject of the speech is a matter of public concern. If the speech is not a matter of public concern, then the speech is unprotected and the inquiry ends. Third, if the employee speaks as a citizen on a matter of public concern, the court must determine whether the employee's interest in commenting on the issue outweighs the interest of the state as employer. Fourth, assuming the employee's interest outweighs that of

23

the employer, the employee must show that his speech was a substantial factor or a motivating factor in a detrimental employment decision. Finally, if the employee establishes that his speech was such a factor, the employer may demonstrate that it would have taken the same action against the employee even in the absence of the protected speech.

Couch, 587 F.3d at 1235 (quotations and citation omitted) (emphases added). Implicit within this five-prong analysis "is a requirement that the public employer have taken some adverse employment action against the employee." Id. at 1235-36 (quotations and citation omitted).

A.    Chatterjee

In granting qualified immunity to Chatterjee, the district court concluded that "Chatterjee did not subject Montaño to an adverse employment action . . . ." J.A. at 1067. More specifically, the district court noted that (1) nothing about Chatterjee's hesitation to select Montaño for the Team Leader position can be considered adverse because Montaño got the job; (2) although some might find Chatterjee's allegedly frequent requests for explanations "annoying or harassing, it simply does not amount to an adverse employment action, particularly when the record contains only unsupported speculation regarding the motivation behind it," id. at 1066; (3) "[t]he fact that Chatterjee disagreed with Montaño's management approach and expressed that disagreement in her performance evaluation of him does not amount to an adverse employment action, even under First Amendment standards," id. at 1067; and (4) "Chatterjee's decision to disconnect Montaño from a color printer in her area . . . simply is not serious enough to amount to an

24

adverse employment action," id.

On appeal, Montaño argues that the district court applied an erroneously restrictive view of what constitutes an adverse employment action under the First Amendment and that as a result, the district court erroneously concluded that the four aforementioned actions did not qualify as adverse employment actions. Montaño contends, additionally, that the district court erred in failing to consider certain other adverse employment actions taken against him by Chatterjee which he also claims are actionable under the First Amendment. We disagree with each of Montaño's suggestions.

Prior to November 2009, there was some confusion in our circuit as to what qualifies as an adverse employment action in the context of First Amendment retaliation. In Maestas v. Segura, 416 F.3d 1182, 1188 n.5 (10th Cir. 2005), the majority noted, in dicta, that "some forms of retaliation *may* be actionable under the First Amendment while insufficient to support a discrimination claim under Title VII." (emphasis added). The majority explained, however, that "we ha[d] never held employment action which may tend to chill free speech is necessarily adverse." Id. "Adding to the dicta," the dissent in Maestas took issue with this explanation, noting that at the time, we had, in fact, previously held that an action which caused a plaintiff to experience a chilling effect was adverse under the First Amendment. Id. at 1195 n.2 (Briscoe, J., dissenting) (citing Belcher v. City of McAlester, Okla., 324 F.3d 1203, 1207 n.4 (10th Cir. 2003)).

25

In Couch, we clarified the parameters of First Amendment retaliation protection, explaining that we consider an employment action to be adverse in the First Amendment retaliation setting if it "would deter a reasonable person from exercising his First Amendment rights." 587 F.3d at 1238 (quotation, citation, and alteration omitted). This test is identical to the test which is applied in Title VII retaliation claims. See Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006).

In addressing Montaño's First Amendment claim against Chatterjee, the district court stated that "[i]n the absence of post-White instruction from the Tenth Circuit," it would continue to apply the standard articulated in Maestas. J.A. at 1065. Montaño argues that because the district court applied the Maestas standard, rather than the White-Couch standard, it necessarily erred in analyzing Chatterjee's four actions which it expressly considered.

However, it is clear that none of these four actions—Chatterjee's not wanting to hire Montaño for the permanent Team Leader position, Chatterjee's harassing Montaño, Chatterjee's performance evaluation of Montaño's FY 2003 work, and Chatterjee's disconnecting Montaño's computer from the color printer—qualify as adverse even under the more permissive standard adopted in Couch. To begin, the district court was correct to note that Chatterjee's reluctance to offer Montaño the Team Leader position cannot be considered adverse because ultimately, Montaño got the job. Moreover, Chatterjee's alleged

26

harassment of Montaño, as well as her partially negative evaluation of Montaño's performance and her disconnection of Montaño's computer from the color printer, would do nothing to deter a reasonable person from exercising his or her First Amendment rights because such acts, at worst, are indicative of common workplace drama.  See White, 548 U.S. at 68 (noting that "petty slights and minor annoyances" are not actionable under this standard); see also Brammer-Hoelter v. Twin Peaks Charter Acad., 492 F.3d 1192, 1208 (10th Cir. 2007) (noting that "a supervisor's surly attitude would probably not deter a reasonable person from exercising his or her First Amendment rights").

Finally, to the extent that Montaño is correct to suggest that the district court failed to consider certain other actions which Chatterjee took, including reprimanding Montaño for airing "dirty laundry," these actions too, fall short of even of Couch's more permissive standard.  Once again, such actions constitute nothing more than the type of everyday differences which are commonplace between supervisors and their employees.

In sum, we conclude that the district court did not err in granting summary judgment to Chatterjee on the First Amendment retaliation claim which Montaño asserted against her.

B.    Reed

In granting qualified immunity to Reed, the district court concluded that Montaño failed to demonstrate Reed's personal participation in any adverse

27

employment action, noting that "the record is devoid of evidence that Reed had authority to make personnel decisions within LANL . . . ." J.A. at 1080. On appeal, Montaño contends that (1) "the district court erred when it considered only one [potentially] adverse employment action, *i.e.*, Mr. Reed's failure to intervene in [the other] defendants' refusal to consider Mr. Montaño for two Internal Audit Group leadership positions in 2004," Aplt. Br. at 48, and (2) the district court erred in concluding that Reed's failure to intervene is not actionable under the First Amendment.

Montaño's allegations against Reed proceed pursuant to a theory of supervisory liability. Although "[t]here is no concept of strict supervisory liability under § 1983," Serna v. Colo. Dept. of Corrs., 455 F.3d 1146, 1151 (10th Cir. 2006) (quotation and citations omitted), supervisors may nonetheless be held liable for constitutional violations perpetrated by their subordinates under the statute. In order to establish a supervisor's liability under § 1983, a plaintiff must not only "show the supervisor's subordinates violated the constitution," id., but also that "an 'affirmative link' exists between the constitutional deprivation and either the supervisor's personal participation, his exercise of control or direction, or his failure to supervise," Fogarty v. Gallegos, 523 F.3d 1147, 1162 (10th Cir. 2008).

In addressing Montaño's appellate arguments, we begin by noting that the district court correctly concluded that Reed cannot be subject to § 1983 liability

28

for his decision not to advocate for Montaño to be hired as Internal Audit Group Leader in September of 2004. Reed averred in his affidavit that he "d[id] not have responsibility for approving personnel actions at [the Lab] other than with respect to the audit director," J.A. at 285, and Montaño's "[v]ague, conclusory statements" to the contrary "do not suffice to create a genuine issue" regarding this fact.[9] Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 674 (10th Cir. 1998). Thus, even if Montaño's failure to be awarded the Internal Audit Group Leader position did somehow constitute actionable retaliation under § 1983, which we doubt, Reed cannot be liable because there is nothing which affirmatively links him to this action.[10]

---

[9] In his opening brief, Montaño contends that proper consideration of (1) "the fact that Mr. Reed, as the University's Auditor, oversaw the Lab's audit function, so he had supervisory responsibility for the Internal Audit Group," (2) "the fact that Mr. Reed was also the administrator of the University's whistleblower policy, yet he was ratifying the other defendants' ongoing retaliation," and (3) "the fact that Mr. Reed had told Congress that he did not know of any prior problems at the Lab, yet Mr. Montaño (along with Messrs. Hook and Wadt) had repeatedly reported problems to Mr. Reed," suffice to create a genuine issue of material fact regarding Reed's personal participation in the decision not to award Montaño the Internal Audit Group Lead position in September of 2004. Aplt. Br. at 49-50.

[10] As we recently observed in Lewis v. Tripp, 604 F.3d 1221, 1227 n.3 (10th Cir. 2010), the Supreme Court's decision in Ashcroft v. Iqbal, --- U.S. ----, 129 S. Ct. (2009), "has generated significant debate about the continuing vitality and scope of supervisory liability . . . in § 1983 suits . . . ." However, as was the case in Lewis, "we need not stake out a position in this debate today," because we conclude that Reed neither personally violated Montaño's First Amendment rights, nor directed others to do so, nor was deliberately indifferent to the fact that a constitutional violation was occurring.

29

Likewise, Montaño's argument that the district court erred in ignoring certain other of Reed's actions also fails. First, Montaño's suggestion that "Reed's failure to supervise or his having tacitly authorized the offending acts [of other defendants] is sufficient evidence to impose supervisory liability on him," Aplt. Br. at 48 (internal quotation marks omitted), is simply too vague create a genuine issue of material fact regarding Reed's personal participation in any allegedly retaliatory behavior. See Adler, 144 F.3d at 674. And second, Montaño's allegation that Reed called his co-worker, Hook, a "whistleblower" during a meeting in the spring of 2003 does not rise to the level of an adverse employment action taken against Montaño.[11] Simply put, a supervisor's imprudent, off-the-cuff remark made to and about a co-worker during a private meeting would not deter a reasonable person from exercising his or her own First Amendment rights.

C.    Marquez, Bretzke, Barr, and Brown

In granting qualified immunity to Marquez, Bretzke, Brown, and Barr, the district court identified four instances of conduct protected by the First Amendment: (1) Montaño's earlier legislative testimony about the Lab's alleged violation of federal anti-discrimination laws in October 2002; (2) his "hotline" complaint with the DOE IG on March 9, 2004; (3) his subsequent disclosure of

---

[11] This remark occurred during a January 2003 meeting between Hook, Marquez, and Reed, and surfaced during discussions about Reed's knowledge of auditing improprieties occurring within the Lab. See J.A. at 597-98.

the data underlying SAPR's auditing report; and (4) his later legislative testimony in October 2004. <u>Id.</u> at 1140-41. The district court also concluded that Montaño had sufficiently demonstrated that the removal of work following SAPR's October 20, 2003 report qualified as an adverse employment action. Montaño's claims failed, however, because he could not demonstrate causation—that is, Montaño could not show that his protected conduct was a substantial or motivating factor in the decision to deny him work. "[T]he record [was] devoid of evidence that . . . Bretzke, Barr, or Brown knew about Montaño's protected speech." <u>Id.</u> at 1145. And even though Marquez was aware of Montaño's public persona, the district court concluded that "a jury could not reasonably infer both knowledge and bad motive by Marquez." <u>Id.</u> at 1146.

The thrust of Montaño's argument on appeal is to link the retaliatory conduct these defendants took against him with the incriminating auditing work he was performing with SAPR, and to that end, Montaño contends that the district court failed to recognize other instances of protected conduct, and failed to recognize several other instances of retaliation as adverse employment actions. His argument, however, fails in two fundamental respects. First, the theory of Montaño's case misapprehends the nature of a claim of First Amendment retaliation: to prevail, Montaño must show a retaliatory link between an adverse employment action and an instance of protected conduct. Whatever retaliation Montaño experienced for the work he performed as a SAPR auditor did not

31

violate his First Amendment rights. See Garcetti v. Ceballos, 547 U.S. 410, 421 (2006) ("[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline."). Second, even if we consider the additional instances of protected conduct that Montaño offers, and grant him the benefit of the doubt by assuming his transfer also qualifies as an adverse employment action, Montaño still fails to demonstrate causation. Montaño cannot demonstrate that Bretzke, Brown, and Barr were aware of any instances of his protected conduct. And for Marquez, the retaliatory link is simply too attenuated and too disconnected for any reasonable jury to conclude in Montaño's favor.

Turning first to the additional instances of protected conduct, Montaño contends that the appearance of his quotations in two newspaper articles also qualifies as protected conduct. The first quote appeared in a December 4, 2002 Albuquerque Journal article that quoted Montaño regarding the Lab's practice of discouraging the reporting of improprieties, J.A. at 814-16; the second quote appeared in the July 25, 2004 Los Angeles Times article quoting Montaño regarding his lack of work, id. at 838-40. For purposes of this appeal, we will assume without deciding that both examples of speech merit First Amendment protection.

We cannot give Montaño the same latitude for every additional adverse

32

employment action he claims to have suffered. From the list he offers, we discern only one action that would potentially deter a reasonable person from exercising his First Amendment rights: Montaño's ultimate transfer from being a veteran auditor within SAPR to being a "recruiter of accounting and finance staff for the Lab's CFO Division." Id. at 666. Thus, we assume without deciding that Montaño's transfer qualifies as an adverse employment action, and reject the remaining actions for lack of merit.[12]

_____

[12] Montaño contends that "Marquez's refusal to respond to [his] complaints about Ms. Chatterjee, and preparing a 'timeline' to monitor his public advocacy," qualified as an adverse employment action. Aplt. Br. at 35. But Marquez's refusal to respond to Montaño's complaints would not deter a reasonable person from exercising his First Amendment rights. And the "timeline" that Marquez created was post hoc. Marquez stated during his unsworn interview that "I actually created a little bit of a chronology . . . . *I tried to kind of go back and focus on* kind of what I call singular Tommy Hook or Chuck Montaño interactions with me." J.A. at 784 (emphasis added).

Montaño also contends that "Marquez's forcing plaintiffs to share their findings with Ms. Brittin" qualified as an adverse employment action. Aplt. Br. at 35. This contention refers to an e-mail that Lab management sent to all employees, which would not deter a reasonable person from exercising his First Amendment rights. See J.A. at 654 (Montaño aff. ¶ 35) ("Lab management emailed all employees, on December 6, 2002, to encourage us to share any information we had about the DOE investigations with Lab managers, particularly with Ms. Brittin."); id. at 596 (Hook aff. ¶ 27) (same).

Montaño also contends that "Marquez's downgrading [of] the SAPR Team" qualified as an adverse employment action. Aplt. Br. at 35. As the district court reasoned, the downgrading of SAPR's reporting relationship might have constituted a demotion for Hook, SAPR's leader, but it cannot qualify as a demotion for Montaño. Moreover, this downgrading occurred in the context of a massive structural reorganization of the Lab, and would therefore not deter a reasonable person from exercising his First Amendment rights.

Montaño also contends that the "downgrading [of his] job evaluation[] based on . . . lack of work," and "Marquez's refusal to respond to [Montaño's]

(continued...)

33

What remains, then, is whether Montaño can demonstrate that his protected conduct was a substantial or motivating factor in the decision to (1) remove work from Montaño after SAPR completed its October 20, 2003 report or (2) transfer him to a recruiting position within CFO. Axiomatic to establishing causation in

$^{12}$(...continued)
requests that this be corrected," qualified as an adverse employment action. Aplt. Br. at 36. But Montaño's job evaluation was never downgraded. Rather, Montaño "proposed to Mr. Marquez that the Lab adjust [his] performance evaluation[] for FY 2004 to match [the one] for FY 2003 . . . ." J.A. at 664. Marquez directed Albert Jiron, a non-party in this case, to give Montaño the "same ORC score as the prior year," id. at 477, and Jiron gave Montaño "credit for work [he] did not do," id. at 668. However unusual this practice appears to be, it does not qualify as an adverse employment action.

Montaño also contends that several instances where Lab management allegedly pressured and threatened him qualified as adverse employment actions. But the record reveals that this conduct was directed at Hook, not Montaño. Therefore, these instances would not deter a reasonable person from exercising his First Amendment rights.

For instance, Montaño contends that "Bretzke[] and Barr[] refus[ed] to allow plaintiffs to provide the SAPR Team's findings and reports to DOE, and threaten[ed] them with losing their jobs if they did so." Aplt. Br. at 35-36. But the record reveals threats toward Hook, not Montaño. See J.A. at 612 (Hook aff. ¶ 67) ("Barr continued to threaten me with termination if I released the report to DOE."). And Montaño's own affidavit avers that management refused to transmit the report, but says nothing about management preventing Montaño from doing so. See id. at 661 (Montaño aff. ¶ 54) ("The Lab never transmitted the SAPR report to DOE . . . . Mr. Marquez refused to provide it.").

The same is true of Montaño's contention that "Barr and Brown[] pressur[ed] plaintiffs to change the facts in the SAPR Team Report . . . ." Aplt. Br. at 36. The pressure was directed at Hook, not Montaño. See J.A. at 612-13 (Hook aff. ¶ 69) ("Barr and Brown continued to pressure me to change the facts in the self assessment report. . . . Marquez and Bretzke had told [Barr] directly that they would fire me if I released the SAPR report directly to DOE.").

For the same reasons, we also reject Montaño's claim that Pace's threat to Hook qualified as an adverse employment action against Montaño. See J.A. at 617 (Hook aff. ¶ 83) ("Pace also told me that he would fire me if I wrote emails and reports like those I sent to Mr. Barr, or if I became a problem.").

34

this context is proof that the employer knew of the employee's protected conduct.

See, e.g., Morfin v. City of Chicago, 349 F.3d 989, 1005 (7th Cir. 2003);

Ambrose v. Township of Robinson, Pa., 303 F.3d 488, 493 (3d. Cir. 2002); Allen

v. Iranon, 283 F.3d 1070, 1076 (9th Cir. 2002).  Beyond this threshold

requirement, we have summarized the causation standard as follows:

> Adverse action in close proximity to protected speech may warrant an inference of retaliatory motive.  But temporal proximity is insufficient, without more, to establish such speech as a substantial motivating factor in an adverse employment decision.  An employer's knowledge of the protected speech, together with close temporal proximity between the speech and challenged action, may be sufficiently probative of causation to withstand summary judgment.  Other evidence of causation may include evidence the employer expressed opposition to the employee's speech, or evidence the speech implicated the employer in serious misconduct or wrongdoing.  On the other hand, evidence such as a long delay between the employee's speech and challenged conduct, or evidence of intervening events, tend to undermine any inference of retaliatory motive and weaken the causal link.

Maestas, 416 F.3d at 1189 (citations omitted).

We agree with the district court that summary judgment was appropriate for

Bretzke, Brown, and Barr because Montaño cannot demonstrate that these

defendants were aware of any of his instances of protected conduct.  Montaño

contends that the Albuquerque Journal and Los Angeles Times articles "clearly

show that [these] defendants – just as members of the general public – had

knowledge of Mr. Montaño's protected conduct."  Aplt. Br. at 41.  But the

existence of two newspaper articles, without more, is insufficient to create a

genuine issue of material fact concerning the knowledge of these defendants.

Montaño also points to some of Brown's comments as circumstantial evidence of knowledge. In early March 2004, Brown told Montaño and Hook that "he had his 'hand slapped by Bretzke for giving [them] work.'" J.A. at 616. On March 29, 2004, Brown wrote an e-mail to Bretzke stating that "[w]e should put some work in [Hook's] hands –Or we will be forced to explain how we let him sit by when there is work to be done." Id. at 978. This evidence is unpersuasive, however, because it does not demonstrate that these defendants knew of Montaño's protected conduct—i.e. his *public* disclosures of Lab improprieties.[13] Because Montaño cannot demonstrate knowledge in this regard, summary judgment was appropriate for these defendants.

Marquez was aware of some of Montaño's protected conduct. Marquez testified at the same legislative hearing as Montaño in October 2002. Marquez also admitted to being "well aware" of Montaño's "public persona," and acknowledged that he kept "pretty meticulous files relative to articles and internal memos, internal news bulletin." Id. at 784, 786. It is reasonable to infer from these statements that Marquez was aware of Montaño's October 2002 legislative testimony, as well as his quotations in the Albuquerque Journal and the Los Angeles Times articles. However, it is not reasonable to infer from these

---

[13] For the same reason, we reject Montaño's argument that the termination threats Bretzke, Brown, and Barr allegedly communicated are probative of their knowledge of Montaño's protected conduct. The threats were directed at Hook, not Montaño, and it is simply unreasonable to infer knowledge of Montaño's protected conduct from threats that were directed at Hook.

36

statements that Marquez was aware of Montaño's March 9, 2004 "hotline" complaint to the DOE or his subsequent disclosure of SAPR data, and Montaño has not identified any other facts from which it would be reasonable to infer knowledge of these particular instances of protected conduct.

Despite Marquez's knowledge of some instances of Montaño's protected conduct, no reasonable jury could conclude that these instances of protected conduct were a substantial or motivating factor in the decision to remove work from Montaño after SAPR completed its October 20, 2003 report. The protected conduct predating this decision includes Montaño's October 2002 legislative testimony and the December 4, 2002 Albuquerque Journal article. The "long delay" between Montaño's speech and the denial of work, as well as the conceptual disconnect between the content of Montaño's legislative testimony and the work he performed as a SAPR auditor, "undermine any inference of retaliatory motive." Maestas, 416 F.3d at 1189. And absent a sufficient retaliatory link at that juncture, no reasonable jury could conclude that the July 25, 2004 Los Angeles Times article was a significant or motivating factor in what Montaño calls the "continued . . . retaliatory actions of denying him work commensurate with his experience and qualifications." Aplt. Br. at 40. The simple fact that Montaño's work status remained unchanged at that point in time undermines any inference of retaliation.

For similar reasons, no reasonable jury could conclude that Montaño's

37

protected conduct was a significant or motivating factor in the decision to transfer him to a position as a recruiter of accounting and finance staff within the CFO division. His earlier instances of protected conduct, the October 2002 legislative testimony and the December 4, 2002 Albuquerque Journal article, are years apart from his transfer, and are therefore too attenuated to support any inference of retaliatory motivation. And the July 25, 2004 Los Angeles Times article was published after Montaño's transfer to a human resources position had largely been finalized. In April 2004, Montaño was offered the opportunity to join the CFO division. Later that month, Montaño e-mailed CFO employees about his specific expectations for the new position, at which time he referred to the position as the "designated recruiter and trainer for professional CFO staff." J.A. at 395. The record also contains a subsequent e-mail conversation that occurred in early July 2004, in which a CFO employee informed Montaño that the proper title for his position would be "Project Administrator, SSM-3," and in which Montaño explained how an "HR Generalist has basically concluded that I'd be taking a major step backwards career-wise if I were to accept the position in question." Id. at 999. Because the terms of Montaño's CFO position were largely finalized prior to the publication of the Los Angeles Times article, the chronology of events undermines any inference that Montaño's ultimate transfer to the CFO division was in retaliation for the exercise of his First Amendment rights. Accordingly, we conclude that the district court properly granted Marquez

38

summary judgment on Montaño's § 1983 claim.

V.    CWPA CLAIM

As previously noted, in his amended complaint Montaño asserted claims under the CWPA against every defendant. Each of the six Lab management defendants moved for summary judgment on these claims, and the district court granted summary judgment to Chatterjee and Reed. However, the district court denied summary judgment to Marquez, Bretzke, Brown, and Barr because of inadequate briefing, and remanded those claims to state court, along with the remaining CWPA claim Montaño asserted against the University.

Because "Montaño is not pursuing his CWPA claim against Ms. Chatterjee on appeal," Aplt. Br. at 4 n.1, we need only consider his CWPA claim against Reed. Unfortunately, however, Montaño fails to address the CWPA in any meaningful manner. Indeed, Montaño's only substantive discussion of the CWPA appears in a footnote to his reply brief wherein he contends that "[a]lthough the First Amendment and CWPA claims differ in their elements and burdens of proof, the same standard applies for determining supervisory liability on both claims, so that a separate argument as to the CWPA claim is not required on appeal." Reply Br. at 30 n.19. Because Montaño has failed to provide any authority which supports his contention, we conclude that his failure to address the CWPA in his opening brief constitutes a waiver of this issue. See Adler, 144 F.3d at 679 ("Arguments inadequately briefed in the opening brief are waived[.]").

## VI.  CONCLUSION

For the reasons stated, we AFFIRM the judgment of the district court.

Entered for the Court

Mary Beck Briscoe
Chief Judge